# 20-3471

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

———————————

BUREAU OF CONSUMER FINANCIAL PROTECTION,
Petitioner-Appellee,

v.

LAW OFFICES OF CRYSTAL MORONEY, P.C.,
Respondent-Appellant.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————

**BRIEF OF APPELLANT LAW OFFICES OF CRYSTAL MORONEY, P.C.**

———————————

NEW CIVIL LIBERTIES ALLIANCE
Michael P. DeGrandis
mike.degrandis@ncla.legal
Jared McClain
jared.mcclain@ncla.legal
1225 19th Street NW, Suite 450
Washington, DC 20036
tel.: (202) 869-5210

*Counsel for Respondent-Appellant*

## CORPORATE DISCLOSURE

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

Appellant Law Offices of Crystal Moroney, P.C., by and through its undersigned

counsel, hereby states that it has no corporate parents and no publicly held

corporation owns 10% or more of its stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE ............................................................ i

TABLE OF CONTENTS.................................................................. ii

TABLE OF AUTHORITIES ........................................................... iv

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ...................................................4

ISSUES PRESENTED .......................................................................4

STATEMENT OF THE CASE ..........................................................5

    A.  The Parties...........................................................................5

        1.    Respondent-Appellant Law Offices of Crystal Moroney, P.C............5

        2.    Petitioner-Appellee CFPB .................................................6

    B.  Background and Procedural History .........................................7

        1.    The First CID and Enforcement Action.................................7

        2.    The Second CID, Ratification, and Enforcement Action ...................8

SUMMARY OF THE ARGUMENT ...................................................9

ARGUMENT ..................................................................................12

I.    TITLE X'S FUNDING STRUCTURE UNCONSTITUTIONALLY DIVESTS CONGRESS OF ITS EXCLUSIVE PREROGATIVE TO APPROPRIATE FUNDING THROUGH LAW ...13

    A.  Title X's Funding Structure Divests Congress of Its Control over CFPB's Appropriations, Reassigning Control to the Executive .................................14

    B.  The Vesting Clause of Article I Prohibits Congress from Divesting Itself of Its Exclusive Responsibility to Make Appropriations Through Law ........17

    C.  Title X Does Not Establish an Intelligible Principle Limiting the President's Discretion or to Which He Must Conform .................................22

    D.  CFPB's Funding Structure Is Unlike Any Funding Structure Previously Conceived by Congress .................................................................29

II.  RATIFICATION CANNOT REHABILITATE THE INVALID CID, BUT EVEN IF IT COULD, THE FORMER DIRECTOR'S ATTEMPTS TO RATIFY WERE INEFFECTUAL .31

    A.  Ratification Cannot Cure Deliberate Constitutional Violations ..............33

    B.  CFPB's Highly Irregular Attempted Ratification Is Invalid Because It Was Not a Detached and Considered Judgment .............................................35

    C.  CFPB Cannot Ratify the Invalid CID Because Retroactivity Would Destroy Appellant's Intervening Rights and Achieve an Inequitable Result 39

    D.  CFPB Cannot Ratify the Unlawful CID Because It Lacked Constitutional Capacity to Issue the CID in November 2019................................................44

III. THE SECOND CID IS UNREASONABLE BECAUSE IT SEEKS INFORMATION PROHIBITED UNDER TITLE X ...........................................................................47

    A.  To the Extent that the Second CID Seeks Information Implicating the Practice of Law, the Second CID Does Not Seek Information Relevant to a Legitimate Purpose .............................................................................48

    B.  To the Extent that the Second CID Seeks Information Already Within the Bureau's Possession, the Second CID Impermissibly Seeks Duplicative Information .......................................................................................52

CONCLUSION...................................................................................................55

CERTIFICATE OF COMPLIANCE....................................................................56

ADDENDUM ......................................................................................................57

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) ..... 23, 24, 25

*Advance Disposal Servs. East, Inc. v. NLRB*, 820 F.3d 592 (3d Cir. 2016).... *passim*

*Buckley v. Valeo*, 424 U.S. 1 (1976) ....................................................................46

*Butz v. Economou*, 438 U.S. 478 (1978)...............................................................35

*CFPB v. Gordon*, 819 F.3d 1179 (9th Cir. 2016) ..................................... 43, 45, 46

*CFPB v. Mortg. Law Grp., LLC*, 157 F. Supp. 3d 813 (W.D. Wis. 2016).............48

*CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729 (S.D.N.Y. 2018) ...... 43, 44

*Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937)............................ 18, 20

*Clinton v. City of New York*, 524 U.S. 417 (1998) ..................................... 19, 20, 41

*Cook v. Tullis*, 85 U.S. 332 (1873) ........................................................................39

*County of Suffolk v. Sebelius*, 605 F.3d 135 (2d Cir. 2010) ..................................18

*Dep't of the Navy v. FLRA*, 665 F.3d 1339 (D.C. Cir. 2012) ......................... *passim*

*Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203 (D.C. Cir. 1998) ..........................................................................................................35

*Endicott Johnson Corp. v. Perkins*, 317 U.S. 501 (1943) ....................................50

*FEC v. Legi-Tech*, 75 F.3d 704 (D.C. Cir. 1996) ........................................... 34, 42

*FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993)................... 41, 42

*Federal Power Com. v. Hope Natural Gas Co.*, 320 U.S. 591 (1944)...................28

*Field v. Clark*, 143 U.S. 649 (1892) .....................................................................20

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010).....29

*FTC v. Am. Tobacco Co.*, 264 U.S. 298 (1924).....................................................47

*Gundy v. United States*, 139 S. Ct. 2116 (2019).................................. 10, 19, 23, 28

*INS v. Chadha*, 462 U.S. 919 (1983) .....................................................................10

*Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 796 F.3d 111 (D.C. Cir. 2015) ................................................................................................................ 11, 35

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928) .........................22

*Loving v. United States*, 517 U.S. 748 (1996) ........................................... 19, 20, 22

*Lucia v. SEC*, 138 S. Ct. 2044 (2018)......................................................... 11, 41, 42

*Mistretta v. United States*, 488 U. S. 361 (1989)................................................ 23, 28

*N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12 (1932) ..................................28

*Nat'l Broadcasting Co. v. United States*, 319 U.S. 190 (1943)..............................28

*Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336 (1974) .....................22

*NLRB v. Noel Canning*, 573 U. S. 513 (2014).......................................................29

*Noel Canning v. NLRB*, 705 F.3d 490 (D.C. 2013) ...............................................42

iv

*Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414 (1990) ..............................18

*Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186 (1946) ...................................48

*OPM v. Richmond*, 496 U.S. 414 (1990) ......................................................... 17, 18

*Oubre v. Entergy Operations*, 522 U.S. 422 (1998) ........................................ 10, 33

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ....................................... 23, 24

*Pape v. Home Ins. Co.*, 139 F.2d 231 (2d Cir. 1943) ................................ 11, 39, 41

*PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018) (*en banc*) .............................29

*SEC v. Wall St. Transcript Corp.*, 422 F.2d 1371 (2d Cir. 1970)............................48

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ............................................. *passim*

*United States v. Associated Merchandising Corp.*, 261 F. Supp. 553 (S.D.N.Y. 1966) ....................................................................................................................47

*United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464 (2d Cir. 1996) ..........48

*United States v. Powell*, 379 U.S. 48 (1964) .........................................................48

*Wayman v. Southard*, 23 U.S. 1 (1825) ...................................................... 10, 19, 20

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ........................................28

*Yakus v. United States*, 321 U.S. 414 (1944)........................................................28

## Statutes

12 U.S.C. § 243.....................................................................................................29

12 U.S.C. § 1815...................................................................................................30

12 U.S.C. § 5481................................................................................................6, 30

12 U.S.C. § 5491............................................................................................. *passim*

12 U.S.C. § 5492..............................................................................................7, 24

12 U.S.C. § 5493 .......................................................................................... 14, 15, 47

12 U.S.C. § 5496...................................................................................................15

12 U.S.C. § 5496a.................................................................................................16

12 U.S.C. § 5497............................................................................................. *passim*

12 U.S.C. § 5511...................................................................................................24

12 U.S.C. § 5512.....................................................................................................7

12 U.S.C. § 5536 ............................................................................................. 24, 30

12 U.S.C. § 5562..............................................................................................4, 36

12 U.S.C. § 5581...................................................................................................24

16 U.S.C. § 6802...................................................................................................30

28 U.S.C. § 1291.....................................................................................................4

39 U.S.C. § 2401...................................................................................................30

## Other Authorities

3 Joseph Story, *Commentaries on the Constitution* § 1342 (1833) ........................21

Alexander Hamilton, *Explanation* (Nov. 11, 1795) in *The Works of Alexander Hamilton*, Vol. VII, (John C. Hamilton ed., S.D.N.Y. Clerk 1851) ....................18

Annual Financial Report FY2020 (Nov. 16, 2020) .................................... 14, 16, 26

Fed. Res. Sys. Purposes & Functions (10th ed. Oct. 2016) .....................................7

Federalist No. 58 (J. Madison) ...................................................................19

GAO-IG Act Annual Report (Feb. 2020) ................................................16

KPMG Independent Audit of Selected Ops. & Budget (Apr. 4, 2019) ..................16

Letter from Kathleen L. Kraninger, CFPB Director, to Mitch McConnell, Sen. Majority Leader (Sept. 17, 2019) ................................................ 33, 37

Restatement of Agency § 89 (1933) .......................................................39

Restatement (Second) of Agency § 87 (1958) ........................................44

Semi-Annual Report of the CFPB (Spring 2020) ....................................15

Zachary S. Price, *Funding Restrictions & Separation of Powers*, 71 Vand. L. Rev. 357 (Mar. 2018) ................................................................21

## Regulations

12 C.F.R. 1075.100 ...............................................................................15

12 CFR 1080.6 ......................................................................................36

Rat. of Bureau Actions Rule, 85 Fed. Reg. 133 (July 10, 2020) ..................... 11, 36

## Constitutional Provisions

U.S. Const. art. I, § 1 (Vesting Clause) ........................................... *passim*

U.S. Const. art. I, § 7 (Bicameralism and Presentment) ................................ *passim*

U.S. Const. art. I, § 9 (Appropriations Clause) ................................................. *passim*

# INTRODUCTION

This appeal offers an object lesson on what happens to civil liberties when Congress purposefully structures an administrative agency to evade the Constitution's carefully calibrated separation of powers. Congress designed the Consumer Financial Protection Bureau ("CFPB") to be free from the political branches—not reliant on Congress for appropriations nor on the President for superintendence of its statutory duties. An agency free to spend more than half-a-billion dollars each year to pursue its law enforcement agenda as it sees fit is accountable to no one. And it has acted like it.

This case began three years prior to *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), a June 29, 2020 Supreme Court decision that severed a provision from CFPB's enabling statute because it violated the separation of powers. At the time of the decision, CFPB had already issued a civil investigative demand ("CID") to Law Offices of Crystal Moroney, P.C. ("Law Firm"), and it did so without a whiff of suspicion of wrongdoing. The Law Firm was a small, woman-owned business with 17 employees, including one attorney. It offered clients debt recovery legal advice and services and maintained a Better Business Bureau ("BBB") rating of "A-". The CID demanded more than three years of documents and information encompassing the entirety of the Law Firm's practice, including confidential and privileged client communications and information. The Law Firm

1

complied to the fullest extent permitted by state bar ethics rules, but that was not enough for CFPB.

The Law Firm's punishment for resisting CFPB was the process itself, which CFPB used as leverage against the small business. Long after the Law Firm's attorneys filed their briefs and began oral argument preparation, just four days before the hearing, CFPB mooted the case by withdrawing the CID. Less than one week after the first case was dismissed, however, CFPB issued a second substantially similar CID, tacking on a demand for an additional two years of documents. Within two weeks, CFPB issued CIDs to at least one client of the Law Firm, and at least one of that client's clients, further tightening the screws. CFPB took every opportunity to make the Law Firm's ability to resist increasingly costly—both financially and reputationally.

Then, *Seila Law* vindicated the Law Firm's constitutional argument that the CFPB Director's tenure protection from the President violated the separation of powers. The Law Firm was right that CFPB had no authority to issue its CIDs. Despite all this, CFPB now asks this Court to whistle past the graveyard, forestall CFPB's day of reckoning with the Constitution, and tacitly approve the agency's atrocious tactics in this case. CFPB claims its ratification cures the unconstitutionality of its prior acts, despite publicly acknowledging that the acts themselves were unconstitutional at least two months prior to issuing the CID.

2

What has changed since June 2017, when all this began? For the Law Firm, the consequences of unconstitutional governmental coercion are palpable. Although the Law Firm's BBB rating has improved to "A," it is nearly insolvent due to costs directly attributable to serial CIDs. Having expended more than $75,000 in compliance and defense costs to date, the Law Firm made drastic reductions in salary and staffing to stay afloat. The once-small business is now a shell of its former self, with a staff of five, and it is out of cost-saving measures to offset additional expenses not related to the business or *legitimate* oversight.

For CFPB, it presses forward as if Supreme Court decisions do not have consequences. It issues let-bygones-be-bygones ratifications without skipping a beat. It is now the first agency in American history to be independent of congressional oversight but completely dependent on the President. Its funding structure is a gross violation of the Constitution. Curiously, *Seila Law*'s rebuke of its structure has emboldened it.

The Law Firm has a right to be free from the unconstitutional exercise of governmental authority, but it has been a victim of that very thing for almost four years. CFPB should not be permitted to violate the Appropriations and Vesting Clauses by receiving funding that is unreviewable by Congress. It should not be permitted to use ratification as an end-run around its knowing breach of the separation of powers. And it should not be allowed to expand its jurisdiction to

interfere with the practice of law or to demand documents and information already in its possession. This Court must put a stop to this rogue agency's disregard for constitutional norms and penchant for abusive tactics.

## JURISDICTIONAL STATEMENT

If CFPB is constitutional, the district court had jurisdiction to decide this case under 12 U.S.C. § 5562(e)(1). After briefing and oral argument, Hon. Kenneth M. Karas granted CFPB's Petition ("Order"). Order (Aug. 19, 2020) (J.A.-9). The Law Firm filed a timely Notice of Appeal. Notice of Appeal (Oct. 21, 2020) (J.A.-10). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Did the district court err in holding that CFPB's funding structure does not violate the Appropriations and Vesting Clauses of the United States Constitution, where CFPB does not receive its funding through bicameral passage and presentment of bills, and its appropriations are the product of the President's unfettered discretion to redirect earnings from a self-funded independent agency?

2.      Did the District Court err in holding that CFPB's Director validly ratified the enforcement proceeding, where ratification is only necessary because the Director knowingly acted without constitutional authority in the first instance, where a highly irregular ratification process evinces the Director's lack of detached and considered judgment, where retroactivity would destroy Appellant's

4

intervening rights and be inequitable, and where nobody at CFPB had the authority to initiate the enforcement action?

3. Did the District Court err in enforcing the Second CID, where the CID regulates the practice of law or interferes with the attorney-client relationship, or where the CID is unreasonably overbroad and unduly burdensome because it seeks documents and information in CFPB's possession?

## STATEMENT OF THE CASE

**A. The Parties**

**1. Respondent-Appellant Law Offices of Crystal Moroney, P.C.**

Crystal G. Moroney, Esq., is the President and Managing Officer of Respondent-Appellant Law Firm. Ms. Moroney is an attorney licensed to practice law in New York and New Jersey. Show Cause Hr'g Tr. at 44 (Aug. 18, 2020) (J.A.-113). The Law Firm principally provides legal advice and services to clients seeking debt recovery solutions. *Id.* at 44 (J.A.-113). The Law Firm employs just one attorney and four support staff. Aff. of Crystal G. Moroney, ECF-023-8, ¶ 5 (Jan. 11, 2021). Although the Law Firm's collection policies and communications with debtors are CFPB-regulated activities, the Law Firm's practice of law is regulated by the New York and New Jersey State Bars. Hr'g Tr. at 44 (J.A.-113).

5

### 2. Petitioner-Appellee CFPB

CFPB was originally conceived as an independent executive agency, 12 U.S.C. § 5491(a), headed by a single Director nominated by the President and approved with the advice and consent of the Senate, *id.* § 5491(b)(1)-(2). CFPB enforces eighteen enumerated consumer-protection laws and prohibits consumer financial activities it deems "unfair, deceptive, or abusive." *Id.* §§ 5481(12), 5531(a). As originally constituted, the Director enjoyed significant autonomy from presidential oversight, serving a five-year term and removable only for cause. *Id.* § 5491(c). CFPB, however, is no longer autonomous from the President. The Supreme Court severed Title X's for-cause removal provision, eliminating CFPB's independence from the President while leaving the balance of Title X intact. *Seila Law*, 140 S. Ct. at 2210-11.

Although "established in the Federal Reserve System" ("Fed"), 12 U.S.C. § 5491(a), CFPB's scope of authority, investigations, enforcement actions, rules, orders, and employees are autonomous from the Fed's Board of Governors

("Board"), *id.* § 5492(c).[1]  CFPB has exclusive rulemaking authority with respect

to consumer financial law.[2]  *Id.* § 5512(b)(4).

 CFPB financial statements are also independent of the Board's and Fed's

statements.  *Id.* § 5497(a)(4)(F).  While CFPB provides OMB with its financial

operating plans, *id.* § 5497(a)(4)(A), OMB does not consent to or approve CFPB's

budget, nor does it have "any jurisdiction or oversight over [CFPB's] affairs or

operations[,]" *id.* § 5497(a)(4)(F).  In sum, CFPB

> acts as a mini legislature, prosecutor, and court, responsible for creating
> substantive rules for a wide swath of industries, prosecuting violations,
> and levying knee-buckling penalties against private citizens.  And, of
> course, it is the only agency of its kind run by a single Director.

*Seila Law*, 140 S. Ct. at 2202 (internal citation omitted).

## B.    Background and Procedural History

### 1.   The First CID and Enforcement Action

CFPB issued a CID to the Law Firm on June 23, 2017 ("First CID").  Hr'g

Tr. at 44 (J.A.-113).  In compliance with the First CID, the Law Firm "produced

thousands of pages of documents and other data" but withheld documents that

---

[1]  The Board is its own independent agency. Fed. Res. Sys. Purposes &
Functions, 3 (Oct. 2016), *available at*
https://www.federalreserve.gov/aboutthefed/files/pf_complete.pdf).

[2]  If regulations "put the safety and soundness of the United States banking
system or the stability of the financial system … at risk[,]" the FSOC may set aside
CFPB regulations by a two-thirds vote.  12 U.S.C. § 5513(a).

7

implicated Ms. Moroney's ethical obligations to her clients. *Id.* at 45 (J.A.-114).

CFPB asserted that the production was "a partial response," since some material

was withheld and clawed back. *Id.* at 44 (J.A.-113). Regardless of the parties'

characterization of completeness, the parties agree that the Law Firm at least

partially complied with the First CID.

CFPB sought to enforce the First CID at a November 8, 2019 hearing, but

just four days prior, CFPB withdrew the CID and moved for dismissal. *Id.* at 46

(J.A.-115). The court denied the Petition to Enforce as moot. Order, 7:19-cv-

01732-NSR, ECF-27 (Nov. 7, 2019). Within hours of the dismissal, CFPB

announced that it would issue a second CID.

### 2. The Second CID, Ratification, and Enforcement Action

CFPB issued a second CID to the Law Firm on November 14, 2019

("Second CID"). Hr'g Tr. at 46 (J.A.-115). The Second "CID sought

'substantially similar' information to the 2019 CID but it's not identical." *Id.* at 44

(J.A.-113). On December 5, 2019, Ms. Moroney's Law Firm petitioned CFPB to

set aside or modify the Second CID on constitutional and statutory grounds. Pet.

to Set Aside, ECF-6-5 (Dec. 5, 2019). On February 11, 2020, the Director denied

the Law Firm's Petition to Set Aside or Modify the Second CID. Decision &

Order, ECF-6-6 at 4 (Feb. 10, 2020) (J.A.-58). CFPB filed its second enforcement

action on April 27, 2020. Am. Pet. to Enforce CID, ECF-6 (Apr. 27, 2020).

8

Then, on June 29, 2020, the Supreme Court severed the CFPB Director's tenure protection. *Seila Law*, 140 S. Ct. at 2210-11. A mere three days later, on July 2, 2020, CFPB filed a Notice of Ratification purporting to ratify this enforcement action, which the Director originally filed knowingly without constitutional authority. Notice of Ratification, ECF-18 (July 2, 2020) (J.A.-66). On August 19, 2020, the court granted CFPB's Petition to Enforce. Order, ECF-29 (Aug. 19, 2020) (J.A.-9).

## SUMMARY OF THE ARGUMENT

Title X was supposed to establish the most independent agency in American history, free from the control of the political branches, ensuring transparency and fairness in consumer financial transactions. Instead, CFPB has become the first federal agency in American history to be independent of Congress but completely dependent upon the President. This dynamic is a direct affront to the Constitution, and it poses a serious threat to civil liberties, as the Law Firm can attest. The district court's Order errs in three principal ways. First, Title X violates the Appropriations and Vesting Clauses of Article I of the Constitution. Second, the Director's attempted ratification was ineffectual. Third, the CID is unreasonable because it seeks information prohibited by Title X.

The "[e]xplicit and unambiguous provisions of the Constitution prescribe and define the respective functions of the Congress and of the Executive in the

9

legislative process." *INS v. Chadha*, 462 U.S. 919, 945 (1983). The explicit and unambiguous provisions of the Appropriations and Vesting Clauses require that Congress make appropriations through the bicameralism-and-presentment process. U.S. Const. art. I, §§ 9, 1, 7. Appropriations are not ministerial powers that may be assigned to the President. *See Wayman v. Southard*, 23 U.S. 1, 45-46 (1825). Congress's "power of the purse" is exclusively legislative, and nondelegable. *See Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012).

Even if appropriations authority were delegable, Title X lacks an intelligible principle to which the President's discretion is limited and to which he could conform. Minimally, an intelligible principle must contain Congress's clear statement of a "general policy." *See Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019). But Title X's purpose is to establish an agency independent from presidential and congressional control, and the President's authority over CFPB's funding contradicts that purpose. *See generally,* 12 U.S.C. § 5491.

If this Court decides that Title X does not violate the Appropriations and Vesting Clauses, the Second CID is still invalid because CFPB's attempted ratification of it was ineffectual. Equitable estoppel bars ratification because the Director exercised governmental power that she knew she could not lawfully wield. *See Oubre v. Entergy Operations*, 522 U.S. 422, 426 (1998). Additionally, a ratification of an unlawful act requires a "detached and considered judgment" of

10

the invalid agent's prior action. *See Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 796 F.3d 111, 118 (D.C. Cir. 2015). But the ratification process in this case was highly irregular because the Director's knowledge of her unlawful acts is unprecedented. Additionally, CFPB did not attempt to ratify its regulations until six days after the ratifying the CID. Rat. of Bureau Actions Rule, 85 Fed. Reg. 133, 41330, § VI (July 10, 2020) (executed July 7, 2020). This incongruity created a jurisdictional problem and a highly irregular ratification process.

Ratification also poses an issue of fundamental fairness. Ratification cannot destroy intervening rights of third parties. *Pape v. Home Ins. Co.*, 139 F.2d 231, 235 (2d Cir. 1943). If CFPB may ratify here, the Law Firm's intervening rights would be destroyed. The Law Firm stands at the brink of insolvency as a direct consequence of the application of unconstitutional governmental coercion. It would be inequitable and render Appellant's right to be free from unconstitutional exercises of governmental authority a mere formalistic pretense.

Moreover, ratification cannot remedy structural constitutional violations in an agency's enabling statute, as CFPB is attempting here. Remedies for structural constitutional violations must advance both the Constitution's structural purposes and create incentives to bring such challenges. *Lucia v. SEC*, 138 S. Ct. 2044, 2055 n.5 (2018). Mere prospective relief frustrates both goals. And it is important to note that nobody at CFPB was accountable to the President upon issuance of the

11

CID, so nobody could issue it or seek its enforcement.  So nobody at CFPB is competent to execute a ratification.

The Second CID is also unenforceable for two independent reasons.  First, CFPB may not regulate the practice of law.  12 U.S.C. § 5517(e)(1).  Its demand directly interferes with the attorney-client relationship.  Second, the CID seeks documents already in CFPB's possession.  CFPB concedes that the Law Firm "had submitted only *partial responses* to the prior CID[.]"  Mem. in Support of Am. Pet., ECF-6-1, at 3 (emphasis added).  Partial or not, CFPB cannot demand duplicative responses.

CFPB's prior breach of the separation of powers and current violation of the Appropriations and Vesting Clauses infects every action CFPB once took, and currently takes.  This malignancy manifests itself here through an irregular and haphazard attempt at ratification, aggrandizement of its jurisdiction, and its unlawful demand for information already in its possession.  This Court should reverse the district court's decision and order dismissal of the Second CID.

## ARGUMENT

The court below erred in three principal ways.  First, Title X violates the Appropriations Clause and the Vesting Clause of Article I of the United States Constitution by divesting Congress of its constitutional prerogative to make appropriations through law.  Second, the Director's attempted ratification of the

invalid CID was ineffectual because the Director cannot ratify her deliberate violations of the Constitution, she did not make a detached and considered judgment, and ratification would inequitably destroy Appellant's intervening rights. Third, the CID is unreasonable because it seeks information prohibited by Title X. Analyzing these issues *de novo*, this Court should reverse the district court and dismiss the offending CID.

## I. TITLE X'S FUNDING STRUCTURE UNCONSTITUTIONALLY DIVESTS CONGRESS OF ITS EXCLUSIVE PREROGATIVE TO APPROPRIATE FUNDING THROUGH LAW

The district court erred by holding that Title X's funding structure does not violate the Appropriations Clause. Title X unconstitutionally divests Congress of the power of the purse—a power which Congress cannot assign to another branch. But even if Congress could delegate its appropriations authority, Title X lacks an intelligible principle necessary to effectuate that delegation.

CFPB's funding structure is unprecedented. Our Constitution does not allow an Executive Branch law enforcement agency to be funded outside of the bicameralism-and-presentment process. The Nondelegation Doctrine's prohibition against this *sui generis* arrangement is even more important where, as here, the President's unreviewable power to appropriate funds is combined with his plenary control over investigations and enforcement priorities of an agency capable of imposing "knee-buckling penalties against private citizens."

13

## A. Title X's Funding Structure Divests Congress of Its Control over CFPB's Appropriations, Reassigning Control to the Executive

CFPB's funding structure is unprecedented because the President controls appropriations of a federal law enforcement agency. Instead of funding through bicameral passage and presentment of appropriations bills as the Appropriations Clause requires, CFPB submits quarterly demands to the Board for Fed earnings. The Board may not modify CFPB's demands or withhold funds. 12 U.S.C. § 5497(a)(1).

Under Title X, the Director may demand funding that he or she unilaterally[3] deems to be "reasonably necessary" to carry out the agency's mission, *id.* § 5497(a)(1), up to a statutory cap of 12% of the Fed's earnings, plus employment cost index increases, *id.* § 5497(a)(2)(A)-(B). FY2020's transfer cap was $696 million.[4] Annual Financial Report FY2020, at 6 (Nov. 16, 2020).[5] CFPB deposits Fed funds into the "Bureau Fund," 12 U.S.C. § 5497(b), which "shall not be construed to be Government funds or appropriated monies" and are entirely under

---

[3] Title X's purpose is to "vest[] significant governmental power in the hands of a ***single individual accountable to no one***." *Seila Law*, 140 S. Ct. at 2200-01 (emphasis added). The single-Director appoints a Deputy, 12 U.S.C. § 5491(b)(5)(A), hires employees, *id.* §§ 5493(a)(1)(A)-(B), *etc.*

[4] If Fed funds are insufficient, CFPB may request more through the bicameralism-and-presentment process. 12 U.S.C. § 5497(e)(2).

[5] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_annual-financial-report_fy-2020.pdf.

CFPB's control until expended, *id.* § 5497(c)(1)-(2).[6] To ensure complete

independence from Congress, the Committees on Appropriations of the House and

Senate are ***prohibited*** from reviewing CFPB's funding. *Id.* § 5497.

Title X specifies four reports that CFPB must produce through the course of

a year. These reports are neither requests for appropriations, nor are they review or

oversight of future appropriations. First, CFPB submits an annual consumer-

complaints report to Congress that provides metrics regarding complaints received.

*Id.* § 5493(b)(3)(C). Second, CFPB must submit a semi-annual report to one

Senate committee and two House committees, none of which is an appropriations

committee, that merely justifies CFPB's self-declared budget from the previous

year, *id.* § 5496(a), (c)(2), listing the amount of Fed funds transferred and

expended by CFPB, *see, e.g.*, Semi-Annual Report of the CFPB, § 2 (Spring

2020).[7]

Third, CFPB submits an annual report to the Senate and House Committees

on Appropriations regarding the Director's financial operating plans and forecasts,

CFPB's current financial condition, results of CFPB operations, and the sources

---

[6] CFPB also maintains a Consumer Financial Civil Penalty Fund ("CPF"). 12 U.S.C. § 5491(d). Civil penalties deposited into CPF are paid to victims or expended for consumer education and financial literacy. 12 C.F.R. 1075.100. CPF's self-funding program is not at issue in this appeal.

[7] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_semi-annual-report-to-congress_spring-2020.pdf.

and application of CFPB funds in the prior year. 12 U.S.C. § 5497(e)(4). This annual report offers only a retrospective of CFPB's stewardship of agency funds, since Appropriations Committees cannot review CFPB's funding demands. *See* Annual Financial Report FY2020. Lastly, CFPB receives GAO and independent auditors' audit reports. 12 U.S.C. § 5496a. The GAO audit primarily assesses whether CFPB's financial statements are accurate, *see* GAO-IG Act Annual Report, § 1.1 (Feb. 2020),[8] and the independent audits primarily assess budget formulation and execution, *see* KPMG Independent Audit of Selected Ops. & Budget, at 5 (Apr. 4, 2019).[9]

In *Seila Law*, the Supreme Court severed from Title X the CFPB Director's tenure protection from the President. *See Seila Law*, 140 S. Ct. at 2210-11. Since CFPB's single-Director now serves at the pleasure of the President, the President has plenary control over CFPB's appropriations. Moreover, since "the CFPB Director has the authority to bring the coercive power of the state to bear on millions of private citizens and businesses, imposing even billion-dollar penalties[,]" the President does now, too. *Id.* at 2189. Indeed, the President and his CFPB enjoy ***two*** layers of financial independence to execute their enforcement

---

[8] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_gao-ig-act_report_2020-02.pdf.
[9] *Available at* https://files.consumerfinance.gov/f/documents/bcfp_independent-audit-selected-operations-budget_fy2018.pdf.

priorities, since Fed earnings are also not appropriated by Congress. *Id.* at 2193-94. This executive-controlled appropriations process over a law enforcement agency has "no basis in history and no place in our constitutional structure." *See id.* at 2201.

**B.    The Vesting Clause of Article I Prohibits Congress from Divesting Itself of Its Exclusive Responsibility to Make Appropriations Through Law**

Congress's duty to make appropriations through law is nondelegable because the Constitution's allocation of prerogative powers among the coordinate branches cannot be reassigned except by constitutional amendment. The Supreme Court has explained that "[e]xplicit and unambiguous provisions of the Constitution prescribe and define the respective functions of the Congress and of the Executive in the legislative process." *Chadha*, 462 U.S. at 945.

One such "explicit and unambiguous provision" is the Appropriations Clause, which states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9. This is a "straightforward and explicit command[.]" *Dep't of the Navy*, 665 F.3d at 1347 (quoting *OPM v. Richmond*, 496 U.S. 414, 424 (1990)) (internal quotations omitted). Congress's responsibility to appropriate, often called "the power of the purse," serves the "fundamental and comprehensive purpose" of "assur[ing] that public funds will be spent according to the letter of the difficult judgments reached

17

by Congress as to the common good[.]" *Richmond*, 496 U.S. at 427-28. The Clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937). *See also* C*ounty of Suffolk v. Sebelius*, 605 F.3d 135, 141 (2d Cir. 2010) (quoting *Richmond*, 496 U.S. at 424).

Alexander Hamilton explained that any deviation from the Article I, § 9 appropriations process is antithetical to the constitutional design:

> The design of the Constitution in this [Appropriations Clause] provision was, as I conceive, to secure these important ends,—that the *purpose*, the *limit*, and the fund of every expenditure should be ascertained by a previous law. The public security is complete in this particular, if no money can be expended, but for *an object*, to an extent, and *out of a fund*, which the laws have prescribed.

Alexander Hamilton, *Explanation* (Nov. 11, 1795) in *The Works of Alexander Hamilton*, Vol. VII, (John C. Hamilton ed. 1851) (emphasis in original). And James Madison explained why it was so important to our structure of government that the Constitution vested this power in Congress:

> This power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure.

Federalist No. 58 (J. Madison). Consistent with this original understanding, "[t]he Clause protects Congress's exclusive power over the federal purse." *Dep't of the Navy*, 665 F.3d at 1347 (internal quotations omitted).

A second "explicit and unambiguous" constitutional provision is the Vesting Clause: "*All* legislative Powers herein granted shall be vested in a Congress[.]" U.S. Const. art. I, § 1 (emphasis added). Only Congress may enact law and may do so only through bicameralism and presentment. U.S. Const. art. I, § 7; *Chadha*, 462 U.S. at 945-46 (emphasizing mandatory language in Article I, §§ 1 & 7, cls. 2-3). Thus, the exclusive authority to enact appropriations law rests with Congress through the bicameralism-and-presentment process. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

"The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress, U.S. Const., Art. I, § 1, and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996); *Gundy*, 139 S. Ct. at 2121. The Nondelegation Doctrine, therefore, does not bar assignment of some non-legislative tasks to another branch. For instance, Congress may assign ministerial powers that are consistent with the assignee's inherent powers. *Wayman*, 23 U.S. at 45-46 (holding that the Judiciary Act's assignment of judicial procedure to the judiciary is consistent with the judiciary's power of superintendence over its docket). Also, Congress may delegate fact-

19

finding to the executive if fact-finding is necessary to implement Congress's policies in contingent—if-this, then-that—laws. *Field v. Clark*, 143 U.S. 649, 693 (1892) ("[The President] was the mere agent of the law-making department to ascertain and declare the event upon which [Congress's] expressed will was to take effect.").

There is a critical constitutional difference, though, between "powers which are strictly and ***exclusively*** legislative[,]" and therefore cannot be assigned, and "powers which the legislature ***may*** rightfully exercise itself[,]" which may be assigned. *Wayman*, 23 U.S. at 42-43 (emphasis added). The Nondelegation Doctrine also prohibits assignments that "call[] for the exercise of judgment or discretion that lies beyond the traditional authority of the President[.]" *See Loving*, 517 U.S. at 772 (distinguishing assignments regarding the President's role as Commander-in-Chief and its inherent power).

In Title X, Congress has assigned its exclusive legislative appropriations duty to the President, who has no inherent power related to appropriations authority outside of the bicameralism-and-presentment process. *See Clinton*, 524 U.S. at 438 (stating that the President cannot enact, amend, or repeal appropriations). Then-Judge Kavanaugh has explained that the Clause serves "as a restriction upon the disbursing authority of the Executive department," *Dep't of the Navy*, 665 F.3d at 1347 (Kavanaugh, J.) (quoting *Cincinnati Soap*, 301 U.S. at

20

321). But Title X surrenders disbursing authority to the President, turning the Appropriations Clause on its head. This unconstitutional assignment carries with it the danger that "the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure." *Id.* (quoting 3 Joseph Story, *Commentaries on the Constitution* § 1342, at 213-14 (1833)).

Acting with reassigned appropriations power, the President now decides how much funding is "reasonably necessary" to carry out the agency's mission, without any meaningful guidance, limitation, or control by the Legislative Branch. The President may choose any amount from $0 to nearly $700 million, without any fact-finding or review by Congress. The purpose of appropriations is to keep the President's pursuit of his agenda "constantly beholden to Congress's willingness to fund it[.]" Zachary S. Price, *Funding Restrictions & Separation of Powers*, 71 Vand. L. Rev. 357, 368 (Mar. 2018). But Title X gives the President an almost literal blank check—plenary control over CFPB's funding, without congressional oversight or interference, giving the President unfettered power to pursue his law enforcement agenda. Hence, Title X's assignment of appropriations authority to the President is patently unconstitutional.

## C. Title X Does Not Establish an Intelligible Principle Limiting the President's Discretion or to Which He Must Conform

Even if Congress could divest itself of its duty to appropriate, it did so

unconstitutionally here because Title X does not articulate an intelligible principle.

The Supreme Court has allowed Congress to "delegate"[10] in some circumstances,

but only if Congress "lay[s] down by legislative act an intelligible principle"

guiding execution of the law.  *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S.

394, 408-09 (1928).

> The intelligible-principle rule seeks to enforce the understanding that Congress may not delegate the power to make laws and so may delegate no more than the authority to make policies and rules that implement its statutes.

*Loving*, 517 U.S. at 771.  A statutory "intelligible principle" is one that limits

executive discretion and requires conformance.  *See Nat'l Cable Television Ass'n*

*v. United States*, 415 U.S. 336, 342 (1974).  This avoids an unconstitutional

---

[10]  The term "delegate" is misleading because it connotes an easily revocable transfer where none exists.  Although Congress may revoke a "delegation," it may do so only through the Article I, § 7's bicameralism-and-presentment process.  That process empowers the President to veto any effort to revoke powers reassigned to his or her office, so Congress cannot unilaterally reverse a delegation.  Congress must obtain the President's assent or secure veto-proof supermajorities in both houses before any previous delegation can be undone.  Thus, by its very nature, "delegation" fundamentally reorders the constitutional system and transforms the relationships between the branches.  "Divestment" more accurately describes this more permanent reordering and transformation of legislative and executive authority, but Appellant uses the term "delegate" in this section to be consistent with intelligible-principle language used by the courts.

22

exercise of legislative power by the executive. *See Gundy*, 139 S. Ct. at 2123

(citing *Mistretta v. United States*, 488 U. S. 361, 372 (1989)).

Minimally, an intelligible principle must contain Congress's clear statement

of a "general policy" stating the "boundaries of [] authority" upon which the

executive may act. *See id.* at 2129. For instance, even if Congress declares a

policy, it cannot delegate authority without standards for presidential action or

without requiring fact-finding as a basis for executive action. *Panama Refining

Co. v. Ryan*, 293 U.S. 388, 415 (1935). In *Panama Refining*, the National

Industrial Recovery Act ("NIRA") allowed the President to prohibit transportation

of petroleum, to aid Great Depression recovery. *See id.* at 406. NIRA was

unconstitutional because it did not qualify the President's authority, establish any

criteria to govern the President, or require any presidential fact-finding as a

condition of action. *See id.* at 415. Moreover, the Court found the statutory policy

of prohibiting "transportation of the excess production" did not substantively limit

anything since the President had unrestrained authority to prohibit transportation,

or not. *See id.* at 415. Likewise, in *Schechter*, the Supreme Court held that

Recovery Act § 3's delegation was unconstitutional because it allowed the

President to "impose his own conditions … as in his discretion he thinks necessary

to effectuate the policy declared by the Act." *A.L.A. Schechter Poultry Corp. v.

United States*, 295 U.S. 495, 538-39 (1935) (internal quotations omitted).

23

"Unfettered discretion" to do what the President "thinks may be needed or advisable" is unconstitutional. *Id.* at 537-38 (1935).

Title X fails the "general policy" test. Its purpose is to establish an agency independent from presidential and congressional control that "enforce[s] Federal consumer financial law consistently for the purpose of ensuring that … markets for consumer financial products and services are fair, transparent, and competitive." *See* 12 U.S.C. §§ 5511, 5491, 5497, 5536(a), 5581. CFPB's Director serves at the President's pleasure, which means that the President has unitary control over CFPB's authority, *id.* § 5492(b), including the Director's quarterly appropriations demand, *id.* § 5497(a). Title X's delegation of appropriations power to the President poses a far worse delegation problem than that in *Panama Refining*, 293 U.S. at 415. The President's new plenary authority over CFPB's funding contradicts Title X's policy of insulating CFPB's funding and enforcement autonomy from the political branches. On this point alone, Title X violates the Nondelegation Doctrine.

That Congress prohibited its appropriations committees from reviewing CFPB funding underscores Congress's goal of leaving funding to the unfettered discretion of the Executive Branch. Instead of principles, Title X has three standardless elements of executive-appropriations: (1) Appropriations must be "reasonably necessary" to fulfill CFPB's law enforcement responsibilities, 12

U.S.C. § 5497(a)(1); (2) appropriations may "tak[e] into account such other sums made available … from the preceding" appropriations period, *id.* § 5497(a)(1); and (3) appropriations may not exceed a percentage of the Fed's annual earnings, plus employment cost index increases, *id.* § 5497(a)(2)(A)-(B).

That which is "reasonably necessary" to perform CFPB's duties does not provide any guidance or limitation at all. In *Schechter*, the delegation was unconstitutional because it allowed the President to "impose his own conditions … as in his discretion he thinks necessary to effectuate the policy declared by the Act." *Schechter Poultry*, 295 U.S. at 538-39 (internal quotations omitted). The same is true here, where the President may appropriate any amount between $0 and the current funding cap of nearly $700 million. And even if the President cannot entirely defund CFPB, his unfettered discretion permits him to reduce appropriations to hinder, if not halt, enforcement he disfavors. Or he could always demand the maximum amount of funds, to add to CFPB's unobligated balance, to drain the public fisc, or to benefit CFPB. There is no articulable principle delimiting the President's discretion to impose his own will on CFPB's appropriations—without regard for the policy declared by the Act. *See id.*

As CFPB's FY2020 Annual Report shows, the gap between appropriations and funding cap varies greatly and is subject to the sole discretion of the President after FY2020:

25



**FIGURE 3:** BUREAU FUND FISCAL YEAR TRANSFERS REQUESTED COMPARED TO THE FUNDING CAP, OBLIGATIONS AND UNOBLIGATED BALANCE ($ MILLIONS)

CFPB Annual Financial Report FY2020, at 9. The significant variance between the cap and appropriations shows the President's unfettered discretion in Title X. Between FY2019-2020, for example, appropriations increased by $69 million and CFPB's balance increased by $7 million. *Id.* But the cap grew only $17 million. *Id.* Since the President does not have to appropriate pursuant to a fact-finding report, "reasonably necessary" has no meaning, it just reflects his singular, unqualified opinion that appropriations and unobligated balance should increase.

Similarly, that the President may "tak[e] into account such other sums made available[,]" when appropriating funds is meaningless. For one, the language is permissive, further reinforcing the President's unchecked discretion over the appropriations. The Report confirms this standard is toothless. It notes that in FY2018, the Director "chose to use" $145 million of CFPB's unobligated balance

26

in lieu of appropriations. *Id.* The Director could so "choose" because unobligated balances have no statutory floor or ceiling, and his choice was an exercise of unfettered discretion. The FY2020 balance of $75 million might be high or low. That judgment is not one based on fact—it is simply up to the President to decide. Regardless, the funds may not be clawed back since appropriations remain under the President's control until expended. 12 U.S.C. § 5497(c)(1)-(2).

That appropriations may not exceed a percentage of the Fed's annual earnings, plus index increases, is neither a measurable standard nor a meaningful limit, either. CFPB has never demanded the full cap, which strongly suggests that the nominal "limit" that Congress placed on CFPB's funding has always exceeded CFPB's enforcement needs. Moreover, adjusting for index increases, that limit only increases each year—and with it, the President's discretion increases. Unlike most budget appropriations, which Congress attends to each fiscal year, Congress has divested its ability to curtail or reassess CFPB's funding in the future absent the President's assent during the bicameralism-and-presentment process or with veto-proof majorities in both houses of Congress. And considering that the cap is a percentage, not a definite number, Congress has limited its own ability to forecast what the full cap will be in years to come.

That the President may choose funding in any amount between $0 and the cap shows that the cap does not provide "boundaries of [] authority" within which

27

the President may act, as required by *Gundy* and the Constitution. *See Gundy*, 139 S. Ct. at 2129.

Cases that uphold delegations where a mere "reasonableness" standard suffices as an intelligible principle are inapt here. Appropriations and other fundamentally legislative tasks do not suffer from "technical problems" associated with "our increasingly complex society," which were deemed to justify delegations in prior cases. *See, e.g.*, *Mistretta v. United States*, 488 U.S. 361 (1989). For example, in upholding the Attorney General's pre-SORNA offender registration rule, the *Gundy* Court relied upon delegations of authority categorically different than the purported delegation on appeal here. This is true of all other permissible delegations, such as those for executive-fixing of air quality standards, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001), sentencing guidelines, *Mistretta*, 488 U.S. 361, chain broadcasting regulations, *Nat'l Broadcasting Co. v. United States*, 319 U.S. 190 (1943), orders authorizing railroad leased-control, *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12 (1932), beef price controls, *Yakus v. United States*, 321 U.S. 414 (1944), and natural gas rate ceilings, *Federal Power Com. v. Hope Natural Gas Co.*, 320 U.S. 591 (1944). These cases bear no resemblance to a delegation of the power of the purse.

Title X violates the Nondelegation Doctrine because it fails to provide any intelligible principle that prescribes the rules for the President's conduct in appropriating funds.

### D.   CFPB's Funding Structure Is Unlike Any Funding Structure Previously Conceived by Congress

As the Supreme Court emphasized in *Seila Law*, "'[p]erhaps the most telling indication of [a] severe constitutional problem' with an executive entity 'is [a] lack of historical precedent' to support it." *Seila Law*, 140 S. Ct. at 2201 (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010)). And there is no historical precedent for CFPB's funding structure. In rare instances not applicable to CFPB, some courts have held that there is an Appropriations Clause exception for some (though certainly not all) governmental institutions that receive funding from "fees, assessments, or investments rather than the ordinary appropriations process." *See PHH Corp. v. CFPB*, 881 F.3d 75, 95 (D.C. Cir. 2018) (*en banc*). But the exception for "self-funded" independent agencies is narrow, so "'these few scattered examples' … shed little light." *See Seila Law*, 140 S. Ct. at 2201 (quoting *NLRB v. Noel Canning*, 573 U. S. 513, 538 (2014) (regarding tenure protected principal officers).

For instance, consider the Fed. Under federal law, the Federal Reserve may "levy semi-annually upon the Federal reserve banks … an ***assessment***[.]" 12 U.S.C. § 243 (emphasis added). Also, the FDIC may require that "[a]ny institution

29

that becomes insured by the [FDIC] … shall pay the [FDIC] any *fee* which the [FDIC] may by regulation prescribe[.]" *Id.* § 1815(d) (emphasis added). The National Park Service "may establish, modify, charge, and collect recreation *fees* at Federal recreational lands and waters[.]" 16 U.S.C. § 6802 (emphasis added). And the United States Postal Service may collect "all *revenues* received by the Postal Service." 39 U.S.C. § 2401(a) (emphasis added). In each of these examples, fees, assessments, or proceeds are collected from users of governmental programs or regulated parties to self-fund those programs.

CFPB, on the other hand, is *not* self-funded. It is funded through the Fed— the President can simply self-determine how much funding CFPB should have, without having to provide any evidence regarding his funding decision. This funding structure is distinct from the "fees, assessments, or investments" from users or beneficiaries of its products or services on which self-funded agencies rely.

Moreover, unlike self-funded entities, CFPB administers *18* federal statutes, 12 U.S.C. § 5481, and a statutory prohibition against "any unfair, deceptive, or abusive act or practice" in the area of consumer finance, *id.* § 5536(a). The Supreme Court noted that

> Congress also vested the CFPB with *potent* enforcement powers. The
> agency has the authority to conduct investigations, issue subpoenas and

30

civil investigative demands, initiate administrative adjudications, and prosecute civil actions in federal court.

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2193 (2020) (emphasis added). No other government agency has this much power to regulate, investigate, and punish, while simultaneously enjoying autonomy from congressional appropriations.

Unconstrained by constitutional checks and balances, the executive power to enforce and the legislative power to fund are consolidated in the Executive Branch, and specifically, in the President. Even the most scrupulous chief executive would find it difficult to resist the temptation use the weight of CFPB to reward friends and punish enemies. Since CFPB does not fit one of the narrow exceptions for self-funded governmental entities, and since CFPB's funding comes from another entity that does not receive appropriations from Congress, CFPB's funding is unconstitutional.

## II. RATIFICATION CANNOT REHABILITATE THE INVALID CID, BUT EVEN IF IT COULD, THE FORMER DIRECTOR'S ATTEMPTS TO RATIFY WERE INEFFECTUAL

If this Court decides that Title X does not violate the Appropriations Clause and Vesting Clause, the Second CID still cannot be enforced, because it is a nullity and CFPB's attempted ratification was ineffectual.

Even CFPB recognized that *Seila Law* rendered the Second CID invalid because Title X unconstitutionally insulated the Director from presidential

removal. *See* Kraninger Decl., ECF-18-1 at ¶¶ 2-3 (July 2, 2020) (J.A.-68-69).

The Supreme Court severed Title X's for-cause removal provision allowing CFPB,

for now, to "remain fully operative without the offending tenure restriction." *Seila*

*Law*, 140 S. Ct. at 2210-11. Chief Justice Roberts explained that whether

ratification occurred or whether ratification is legally sufficient to cure the

consequences of Title X's constitutional defects retroactively, is for lower courts to

decide because *Seila Law*'s parties did not brief that issue. *See id.* at n.12.

For a ratification to be valid, the ratifier must: (1) "still have the authority"

to take the action that the agent invalidly undertook; (2) have full knowledge of the

unlawful action; and (3) make a detached and considered affirmation of the

unlawful action. *See Advance Disposal Servs. East, Inc. v. NLRB*, 820 F.3d 592,

602 (3d Cir. 2016). The "last two requirements are intended to ensure that the

ratifier does not blindly affirm the earlier decision without due consideration." *Id.*

at 602-03.

The court below erred by holding that the Director ratified the invalid CID

for at least four reasons. First, the Director's deliberate violation of the separation

of powers cannot be cured through ratification. Second, CFPB's highly irregular

ratification attempt was invalid because it was not the product of a detached and

considered judgment. Third, ratification cannot be used, as is attempted here, to

destroy the intervening rights of third parties or to create an inequitable result.

32

Fourth, nobody at CFPB had the constitutional capacity to issue the Second CID in November 2019.

### A.     Ratification Cannot Cure Deliberate Constitutional Violations

The district court erred by not addressing the Law Firm's assertion that ratification is unavailable where the ratifier knowingly acted without authority in the first instance.  CFPB's Director intentionally violated the Constitution by pursuing this investigation prior to severance of the constitutionally defective for-cause removal provision.  Equitable estoppel bars ratification here because the Director knowingly ***shirked the burdens*** of Title X's unconstitutional for-cause removal provision, while she ***retained the benefit*** of her tenure-protected office's authority to initiate investigations and seek judicial enforcement.  *See Oubre*, 522 U.S. at 426 ("As a rule, equitable estoppel bars a party from shirking the burdens of a voidable transaction for as long as she retains the benefits received under it.").  CFPB cannot have it both ways.

From at least September 17, 2019, CFPB "determined that the for-cause removal provision of the [CFPA] is unconstitutional."  Letter from Kathleen L. Kraninger, CFPB Director, to Mitch McConnell, Sen. Majority Leader (Sept. 17, 2019).  Considering this acknowledgement predated CFPB's mooting of the First CID, there was no reason for CFPB to issue another CID when the Director knew she had no lawful authority to act.  Nevertheless, CFPB issued the Second CID on

November 14, 2019, denied the Law Firm's Petition to Set Aside on February 10,

2020, and petitioned the district court for enforcement on April 27, 2020.

Moreover, CFPB's February 10 Decision and Order refused to defer the CID's

deadlines until the Supreme Court decided the constitutionality of the Director's

removal restriction in *Seila Law*, despite that CFPB had already asked the Court to

sever the removal restriction. *Compare* Decision & Order at 2 (Feb. 10, 2020)

(J.A.-56) *with* Resp't's Brief, *Seila Law LLC v. CFPB*, No. 19-7, at 7 (Sept. 17,

2019). Such obstinate refusal evinces the unclean hands with which CFPB would

later seek ratification, despite the Law Firm's successful challenge to CFPB's

authority through *Seila Law*.[11]

There is no precedent permitting enforcement-action ratification where an

agency intentionally violated a regulated party's constitutional right to be free from

unlawful exercises of governmental authority. Where agencies make good-faith,

inadvertent mistakes believing their authority to be constitutional, only to be

proven wrong later, courts often use their equitable discretion to allow ratification

to rehabilitate the unlawful actions. *See, e.g.*, *Advance Disposal*, 820 F.3d at 603;

*FEC v. Legi-Tech*, 75 F.3d 704, 709 (D.C. Cir. 1996). But that is not the case here.

No court has ever permitted intentional unconstitutional acts to be cured by

---

[11] In the first enforcement action and in the second administrative
proceeding, the Law Firm argued that Title X violated separation of powers.

34

officials who "discharge their duties in a way that is known to them to violate the United States Constitution[.]" *Cf. Butz v. Economou*, 438 U.S. 478, 507 (1978) (explaining that officers have immunity from damages for "mere mistakes in judgment" but not knowing constitutional violations). Thus, the Director's attempt to ratify her prior unconstitutional acts are ineffectual.

**B.     CFPB's Highly Irregular Attempted Ratification Is Invalid Because It Was Not a Detached and Considered Judgment**

CFPB did not undertake a detached and considered review of the CID, and the court below erred in presuming that CFPB's purported ratification was regular. A ratification of an unlawful act requires a "detached and considered judgment" of the invalid agent's prior action. *See Intercollegiate*, 796 F.3d at 118 (quoting *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 213-14 (D.C. Cir. 1998)). The ratifier may not blindly affirm the earlier unauthorized decision without due consideration. *Advance Disposal*, 820 F.3d at 602-03.

On July 1, 2020—just three days after *Seila Law*—CFPB executed its Notice of Ratification of this enforcement action (filed July 2). Ratification Declaration, ECF-18-1 (July 2, 2020) (J.A.-68). In a five-paragraph Declaration, the Director claims to have considered the basis for the decision to issue the Second CID, to deny Appellant's request to modify or set aside the CID, and to petition the district court for CID enforcement. *Id.* at ¶ 4 (J.A.-69). Conspicuously absent from her

35

Declaration is an explanation as to why the Director initiated each of these actions while knowingly lacking the authority to do so.

Six days *after* ratifying the Second CID, the Director executed a second ratification purporting to retroactively validate a decade of CFPB regulations and guidance. Rat. of Bureau Actions, 85 Fed. Reg. 133, 41330, § VI. The second ratification manifests a significant incongruity. Title X prohibits CFPB from seeking court-ordered CID-enforcement until its Director resolves petitions to modify or set aside CIDs. 12 U.S.C. § 5562(f). CFPB's regulations control the CID-set-aside process, requiring a timely meet-and-confer, and defining the scope and nature of the petition, enforcement response, and the Director's disposition, among other things. 12 CFR 1080.6(c)(3) & (e). So, although express ratifications may not usually require intricate detail, the court below was wrong to conclude that there was "really no actual evidence to establish that the director failed to conduct an independent evaluation or make a detached considered judgment," since the regulation that established the prerequisites for seeking judicial enforcement was ratified *after* the CID and enforcement action. *See* Hr'g Tr. at 71 (J.A.-140) (generally citing *Advance Disposal Servs.*). This cart-before-the-horse temporal incongruity is, at a minimum, highly irregular.

Considering this irregularity, CFPB's assertion that the Director reviewed— in just *three days* after *Seila Law*—all filings, documentation, arguments, findings,

36

and decisions associated with the Law Firm's two-CID and ***three-year long***

engagement with CFPB, is not credible.  All the while, over the course of the next

***six days***, the Director supposedly reviewed all the regulations, guidance

documents, and supporting documentation that accumulated over the ***ten-year***

history of CFPB.  That the ratifications were executed backwards and that there

was a one-week gap between them is substantial evidence that the ratifications

were not detached and considered, or at least that CFPB is not entitled to a

presumption of regularity in the ratification of the Second CID and subsequent

enforcement action.

      Moreover, CFPB does not deserve the benefit of the doubt regarding the

*bona fides* of its ultra-rapid ratification, given its willingness to ask the district

court to exercise jurisdiction over this matter in April 2020, when CFPB knew its

CID was constitutionally defective.  In September 2019, two months prior to

issuing the Second CID and four months prior to filing the Petition to Enforce,

Director Kraninger officially announced to Congress that her office was

unconstitutional.  *See* Kranginger Letter (Sept. 17, 2019).  Despite openly

acknowledging her lack of constitutional authority to direct CFPB's enforcement

action, CFPB plowed ahead in this case, even opposing a stay to await the

Supreme Court's determination in *Seila Law*.[12]  Once the Supreme Court ruled that

CFPB had been proceeding unconstitutionally, Director Kraninger ratified her

prior unconstitutional actions almost immediately.  These actions do not show the

detached and considered judgment required for a lawful ratification—they show a

disturbing disregard for the law.

By the time the Director officially admitted that her office was

unconstitutional, the Law Firm had been subjected to more than two years of an

unlawful investigation.  Nevertheless, the Director proceeded to press the

enforcement of the First CID in district court, moot it, and then issue the Second

CID and enforce it, knowing that she had no power to do any of those things.

Then, more than three years into the unconstitutional investigation and

enforcement of invalid serial CIDs, CFPB asks that it be allowed to proceed as if

nothing ever happened.  As if it never breached the separation of powers.  As if

there is no consequence to the Supreme Court's holding that Title X's structure is

unconstitutional.

This unlawful behavior cost Appellant time away from her family and work,

and legal fees petitioning a Director to set aside a CID that the Director knew she

lacked the authority to adjudicate—to say nothing of the stress and strain of being

---

[12]  All authority at CFPB flows through the Director.  *Seila Law*, 140 S. Ct.
at 2200-01 (Title X's purpose is to "vest[] significant governmental power in the
hands of a single individual accountable to no one.").

subjected to a government investigation that the Director knew to be

unconstitutional. The calendar and CFPB's admission regarding Title X's

constitutionality speak for themselves—the purported ratification was highly

irregular and neither detached nor considered. The enforcement action should be

dismissed.

### C. CFPB Cannot Ratify the Invalid CID Because Retroactivity Would Destroy Appellant's Intervening Rights and Achieve an Inequitable Result

The district court erred by holding that Appellant's injury was remedied the

moment the structural constitutional defect in the Director's office was cured. It is

"well settled … that ratification does not date back to destroy intervening rights of

third persons or otherwise to achieve an inequitable result." *Pape*, 139 F.2d at 235

(citing Restatement of Agency § 89 (1933)). "[R]atification operates upon the act

ratified precisely as though authority to do the act had been previously given,

***except*** where the rights of third parties have intervened between the act and the

ratification." *Cook v. Tullis*, 85 U.S. 332, 338 (1873) (emphasis added). "The

retroactive efficacy of the ratification is subject to this qualification." *Id.* CFPB's

ratification cannot be valid because, if it were, retroactivity would destroy

Appellant's intervening right to be free from unlawful governmental coercion, and

it would be inequitable since the Law Firm has been subjected to unlawful

coercion for three-and-a-half years at great personal, professional, and economic expense.

During the period when Title X's for-cause removal provision was violating the separation of powers, a fact of which CFPB was aware for at least nine months before the purported ratification, the Law Firm expended $75,000 in fees and expenses, and was forced to lay off nearly half of the staff before the end of 2019. Aff. of Crystal G. Moroney, ECF-23-8, ¶¶ 13, 16. The Law Firm has expended an additional $5,000 in the Second CID's administrative proceeding, prior to the purported ratification. *Id.* ¶ 27. Ms. Moroney cut her salary from $155,000 prior to June 2017, to $96,600 today, to keep up with legal bills and CID-related costs. *Id.* ¶ 17. Appellant suffered these concrete and particularized harms, among others, at the hands of an agency that lacked the constitutional authority to impose them. Appellant had a right to be free from such unlawful exercise of governmental authority, but ratification would compound, rather than vindicate, that right. This Court should not allow CFPB to ratify the CID because the Bureau's *pro forma* ratification, after knowingly proceeding against the Law Firm without lawful authority, would be inequitable and render Appellant's right to be free from unconstitutional exercises of governmental authority a mere formalistic pretense.

40

Moreover, ratification cannot remedy structural constitutional violations in an agency's enabling statute, as CFPB is attempting in this case. The Supreme Court has held that remedies for structural constitutional violations must advance both the Constitution's structural purposes and create incentives to bring such challenges. *Lucia v. SEC*, 138 S. Ct. 2044, 2055 n.5 (2018). Mere prospective relief for those subjected to the coercion of unconstitutional structures frustrates both Supreme Court goals.

Because separation-of-powers challenges exist to secure individual liberty, *Clinton*, 524 U.S. at 452, ratification "destroy[s the public's] intervening right[]" to be free from unlawful exercises of governmental authority and "achieve[s] an inequitable result[,]" *see Pape*, 139 F.2d at 235. Ratification also all but eliminates officials' disincentives to act beyond the bounds of their lawful authority, transmuting the public's successful challenges into pyrrhic victories. Actions taken by unconstitutionally structured agencies, therefore, must be nullities. *See Seila Law*, 140 S. Ct. at, 2221 (Thomas, J., concurring and dissenting).

*FEC v. NRA Political Victory Fund* is instructive here. The D.C. Circuit held that the FEC's congressionally appointed members violated the separation of powers and, since this violation was a defense to an enforcement action, prospective relief was not enough. *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 827-828 (D.C. Cir. 1993), *aff'd on other grounds*, *FEC v. NRA Political*

41

*Victory Fund*, 513 U.S. 88 (1994). Thus, the court dismissed the action because unconstitutional structures must afford regulated parties retroactive relief. *See id.* at 828.

In *Lucia v. SEC*, the Supreme Court held that a successful challenge to the constitutional structure of the SEC "is entitled to relief." *Lucia*, 138 S. Ct. 2044 at 2055. To provide Lucia with complete relief, the Court ordered "a new hearing before a properly appointed official … [t]o cure the constitutional error" of the invalid appointment of SEC ALJs. *See id.* (quoting *Ryder v. United States*, 515 U.S. 177, 183 (1995)). Likewise, in *NLRB v. Noel Canning*, the Supreme Court affirmed the D.C. Circuit's holding that NLRB proceedings that violated the Recess Appointments Clause were void *ab initio* because they "implicate[d] fundamental separation of powers concerns." *Noel Canning v. NLRB*, 705 F.3d 490, 514 (D.C. 2013), *aff'd NLRB v. Noel Canning*, 573 U.S. 513, 557 (2014).

*FEC v. Legi-Tech* does not depart from this line of cases. The D.C. Circuit held that the FEC validly ratified its enforcement action because the Commissioners who lawfully voted for enforcement were the same Commissioners who ratified their vote after the unconstitutional ***nonvoting*** members were removed. *See Legi-Tech*, 75 F.3d at 708. At all times, the Commission and its ***voting*** Commissioners were constitutional. *See id.*. Even so, the FEC held a ***three-day hearing*** to consider whether to ratify. *Id.* at 706. The court below

42

wrongly asserted that *Legi-Tech* stands for the proposition that where "it is virtually inconceivable that [agency] decisions would differ in any way the second time[,]" enforcement actions are ratifiable.  Hr'g Tr. at 66 (J.A.-135) (internal quotations omitted).  The district court's futility-holding has neither merit, nor precedential support.  *Legi-Tech* permitted ratification because the FEC was at all times empowered to act through its voting members, so jurisdiction to bring an enforcement action was not at issue.  *See Gordon*, 819 F.3d at 1202 n.5 (Ikuta, J., dissenting) ("*Legi-Tech* held that a properly constituted FEC had the authority to continue an enforcement action, and did not address any standing issue.").  On the other hand, CFPB's unconstitutional structure directly implicates the district court's jurisdiction to hear the enforcement action in the first instance.

As the Supreme Court noted, CFPB's "Director has the ***sole*** responsibility to administer 19 separate consumer-protection statutes[.]"  *Seila Law*, 140 S. Ct. at, 2199.  CFPB's defective directorship involved "the structure and authority of the CFPB itself, not the authority of an agent to make decisions on the CFPB's behalf."  *RD Legal Funding, LLC*, 332 F. Supp. 3d at 785 (holding that ratification cannot cure CFPB's for-cause removal defect).  "[R]atification does not cure the constitutional injury—enforcement of an investigative demand by an unconstitutionally insulated Director."  *Seila Law*, 140 S. Ct. at 2221 (Thomas, J., concurring and dissenting in part).

43

**D.     CFPB Cannot Ratify the Unlawful CID Because It Lacked Constitutional Capacity to Issue the CID in November 2019**

The court below erred by holding that either the Director or CFPB was a valid principal when the unlawful CID first issued.  "Ratification addresses situations in which an agent was without authority at the time he or she acted and the principal later approved of the agent's prior unauthorized acts." *RD Legal Funding*, 332 F. Supp. 3d at 785.  *See also* Restatement (Second) of Agency § 87 (A.L.I. 1958) ("To become effective as ratification, the affirmance must be by the person identified as the principal at the time of the original act or, if no person was then identified, by the one for whom the agent intended to act.").

The court incorrectly interpreted the requirement that "the party ratifying should be able not merely to do the act ratified at the time the act was done, but also at time the ratification was made[,]" as merely "a timing issue."  *See* Hr'g Tr. at 61-62 (J.A.-130-31).  The court engaged in the wrong line of inquiry.  The court should have asked a two-part question: (1) did someone with legal authority to issue the CID on November 14, 2020 ratify it; and if that person ratified it, (2) did the ratification defeat "[t]he intervening rights of third persons[?]"

The court cited *Advance Disposal*, where the Third Circuit held that the NLRB was "both the principal and the agent, simply acting at different points in time."  *Advance Disposal*, 820 F.3d at 602.  But *Advance Disposal* is an Appointments Clause case.  The offices held by the Board were not questioned as

44

constitutional there—it was only ***the how*** of the members holding their offices that was invalid. *Id.* at 596 (challenging the composition of a board constituted through recess appointments, not the structure of the NLRB itself). Once the board's members became validly appointed, the board could act as principal to ratify prior unlawful acts. *Id.* at 602.

The district court also cites *CFPB v. Gordon*, but that case is like *Advance Disposal*. The Recess Appointments Clause raised an issue regarding whether CFPB's Director validly held that office, not whether the office itself was constitutional. *Gordon*, 819 F.3d at 1192.

Based on these inapposite cases, the district court below incorrectly concluded "that there appears to be no limitation that would prevent Director Kraninger from bringing an enforcement action[.]" Hr'g Tr. at 64 (J.A.-133). But in this case, the directorship ***itself*** was unconstitutional, not the Director's appointment. The Second CID cannot be ratified because, as the Supreme Court observed, CFPB's "single-Director structure is an innovation with ***no foothold in history or tradition***." *Seila Law*, 140 S. Ct. at, 2202 (emphasis added). Additionally, "the Director has the ***sole responsibility*** to administer 19 separate consumer-protection statutes[.]" *Id.* at 2200 (emphasis added). Title X's purpose is to "vest[] significant governmental power in the hands of a ***single individual accountable to no one***." *Id.* at 2200-01 (emphasis added).

45

The structural defect in Title X goes to the heart of the agency's statutory authority to act, so the court's assertion that if the Director was not a valid principal, the CFPB was, flies in the face of well-settled Article III standing requirements. *See* Hr'g Tr. at 64 (J.A.-133). CFPB cannot operate as a principal independent from its officers. *Hollingsworth*, 570 U.S. at 710. Moreover, only officers of the United States may initiate civil litigation in federal courts. *Buckley v. Valeo*, 424 U.S. 1, 140 (1976). This is because "Congress cannot confer executive authority to bring civil enforcement action on an entity created by statute." *Gordon*, 819 F.3d at 1203 (Ikuta, J., dissenting) (citing *Buckley*, 424 U.S. at 137). In other words, when CFPB issued the CID, adjudicated the Law Firms objections, and sought enforcement in court, ***nobody*** at CFPB was accountable to the President, so ***nobody*** could represent CFPB in court to enforce the CID.[13]

A plaintiff must have standing "when the suit is filed," *Davis*, 554 U.S. at 734, and "throughout all stages of litigation[,]" *Hollingsworth*, 570 U.S. at 705.

---

[13] If anyone could act as CFPB's principal prior to *Seila Law*, it was the President. *See Seila Law*, 140 S. Ct. at 2211 ("In our constitutional system, the executive power belongs to the President, and that power generally includes the ability to supervise and remove the agents who wield executive power in his stead."). The court below was wrong to assert that the President could not ratify "because it would be impossible for one man[.]" Hr'g Tr. at 64 (J.A.-133). The President heads the Office of President of the United States, which includes OMB, which routinely reviews all manner of agency action, and is perfectly capable of assisting the President in reviewing CFPB's prior unlawful acts for possible ratification.

Yet, no one had the executive authority to bring CFPB's enforcement action until June 29, 2020—two months *after* it filed its petition. Before *Seila Law*, nobody at CFPB had authority to issue the CID because the Director's office was invalid, and CFPB's inferior officers had been appointed by an invalid Director. *See* 12 U.S.C. §§ 5491(b)(5), 5493(a)(1) (deputy director and "all employees" including "attorneys"). Without any officers, CFPB could not invoke federal court jurisdiction, so the Second CID should be dismissed.

## III. THE SECOND CID IS UNREASONABLE BECAUSE IT SEEKS INFORMATION PROHIBITED UNDER TITLE X

The Second CID is unenforceable, in whole or in part, because it impermissibly seeks to regulate the practice of law or to interfere with the attorney-client relationship, and it seeks documents already in CFPB's possession. The district court erred by holding otherwise. *See* Hr'g Tr. at 77 (J.A.-146). Additionally, although the district court acknowledged that CFPB has some information in its possession, the Court erred by neglecting to strike duplicative demands from the CID. *See* Hr'g Tr. at 77 (J.A.-146).

"It is clear, even in the investigative cases, that respondents may object to the subpoena on the ground of relevance and upon the ground of oppressiveness, *i.e.*, the undue burden of compliance." *United States v. Associated Merchandising Corp.*, 261 F. Supp. 553, 560 (S.D.N.Y. 1966) (citing *FTC v. Am. Tobacco Co.*, 264 U.S. 298, 307 (1924)). A federal agency may investigate without probable

47

cause, but it may not "conduct any investigation it may conjure up; the disclosure sought must always be reasonable." *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 471 (2d Cir. 1996) (citing *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946)).

> This limitation of reasonableness is satisfied "so long as an agency establishes that an investigation 'will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought ***is not already within [its] possession***, and that the administrative steps required … have been followed.'"

*Constr. Prods. Research, Inc.*, 73 F.3d at 471 (quoting *SEC v. Wall St. Transcript Corp.*, 422 F.2d 1371, 1375 (2d Cir. 1970) (quoting *United States v. Powell*, 379 U.S. 48, 57-58 (1964)) (emphasis added).

## A. To the Extent that the Second CID Seeks Information Implicating the Practice of Law, the Second CID Does Not Seek Information Relevant to a Legitimate Purpose

CFPB's jurisdiction is expansive, but it does not include the practice of law. Indeed, Congress did not intend for CFPB "to act as a federal version of the state bar authorities." *CFPB v. Mortg. Law Grp., LLC*, 157 F. Supp. 3d 813, 825 (W.D. Wis. 2016). Congress was clear on this point, commanding that "[t]he Bureau ***may not exercise any supervisory or enforcement authority*** with respect to an activity engaged in by an attorney ***as part of the practice of law*** under the laws of a State in which the attorney is licensed to practice law." 12 U.S.C. § 5517(e)(1) (emphasis added). That is not to say that CFPB cannot demand of an attorney,

48

whose services implicate one of the 19 statutes administered by CFPB, or who may engage in unfair or deceptive collection practices, documents and information related to his or her engagement with financial consumers—of course, it may. *See id.* § 5517(e)(2).

CFPB cannot, however, interfere with attorney-client relationships or demand from an attorney documents or information that is confidential or privileged between attorney and client. Such is the circumstance presented in this case, where CFPB seeks to compel disclosure of client documents and information which Appellant has an ethical obligation to keep confidential. CFPB does not— because it cannot—allege that the Law Firm's contacts and communications with clients took place outside the attorney-client relationship. Nor does it allege waiver of confidences or privilege.

The Second CID's ostensible purpose is to determine whether the Law Firm has been responsive to consumers who provide information contradicting the Law Firm's record of consumers' debt, and whether the Law Firm corrects its records and makes required reports in such instances. *See* Am. Pet. to Enforce CID, ECF-6, ¶ 1. This purpose is irrelevant to the attorney-client confidences and privileged information withheld by the Law Firm. Even aside from the limits on CFPB's jurisdiction in 12 U.S.C. § 5517(e), CFPB would still not be entitled to confidential and privileged documents.

49

The Supreme Court has explained that one limitation on an agency's broad authority to issue administrative subpoenas is determined by whether the agency could fully perform its statutory duty without the information demanded. *See Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 507-08 (1943). While the facts of the Supreme Court case of *Endicott Johnson Corp. v. Perkins*, are different from the facts in this case (for example, *Endicott Johnson* involved a government contractor, not a law firm, and the contractor had admitted to prior wrongdoing, whereas the Law Firm has not been even accused of wrongdoing), the Supreme Court set forth an important principle. In that case, the contractor argued that the Secretary of Labor's administrative subpoena for certain payroll information was unenforceable because it was irrelevant to the minor violations discovered by the Department of Labor. *Id.* at 505-06. The Court reasoned that one of the Secretary's principal functions was to decide questions of fact regarding government contractors who were ineligible for awards after a labor violation, and information regarding payrolls and underpayments was "clearly related" to the violation. *See id.* at 508. Therefore, the Secretary could issue an administrative subpoena to collect the information necessary to render a complete decision on the contractor's alleged violations—because "[t]he evidence sought by the subpoena was not plainly incompetent or irrelevant to any lawful purpose of the Secretary[.]" *Id.* at 509.

50

Thus, a critical question regarding whether the scope of CFPB's administrative subpoena is reasonable, is: Can CFPB fully perform its statutory duty without the attorney-client confidences and privileged materials that CFPB demands in this enforcement action? The answer to this question is an emphatic *yes*. Client confidences and privileged materials are "plainly incompetent or irrelevant" to any conceivable "lawful purpose" of the Director or the Bureau. *See id.*. The Law Firm substantially complied with the First CID by providing written responses to interrogatories and by producing thousands of pages of documents and data. The documents and data covered all issues under investigation in the First and Second CIDs, and included the Law Firm's policies, procedures, data, reports, and contact with third parties—including debtors. Nevertheless, CFPB demands disclosure of material related to the Law Firm's contact with its ***clients***. The Bureau's overbroad, unfettered, and wholesale request for information relating to the Law Firm's representation of its clients is patently improper.

If CFPB seeks information as to the credit-granting or debt-collection practices of the Law Firm's clients, CFPB can generate a tailored request to one or more clients seeking specific information. CFPB, however, should not be permitted to serve, much less enforce, a CID on a ***law firm*** and reach the universe of information that the Law Firm possesses relating to the representation of its clients, to include an expansive number of documents that the Law Firm is duty-

51

bound to keep confidential.  Thus, since attorney-client confidences and privileged material are excluded from CFPB's jurisdiction, and since they are plainly irrelevant to any lawful purpose of the Director or CFPB, this Court should reverse the district court's enforcement of the Second CID to the extent that it seeks material related to the practice of law.

**B. To the Extent that the Second CID Seeks Information Already Within the Bureau's Possession, the Second CID Impermissibly Seeks Duplicative Information**

The Law Firm has already supplied many, if not most, of the documents and information sought by this enforcement action.  CFPB freely admits that it may seek enforcement of a CID only where it does not already have the information in its possession.  Am. Pet. to Enforce CID, ECF No. 6, ¶ 11.  CFPB is wrong to allege that the materials sought by the Second CID are "not already in the Bureau's possession."  *Id.* ¶ 14.  CFPB asserts that, "[w]hile the prior CID sought ***substantially the same set of materials*** requested by the 2019 CID, the two CIDs were not identical[,]" but this does not contradict the fact that it has responsive documents, interrogatories, and reports in its possession.  Mem. in Support of Am. Pet. at 2-3 (emphasis added).

Furthermore, CFPB concedes that Ms. Moroney's Law Firm "had submitted only ***partial responses*** to the prior CID[.]"  *Id.* at 3 (emphasis added).  While the parties have a genuine dispute regarding the lawful scope of the Second CID, it is

52

disingenuous for CFPB to compel the Law Firm "to comply fully with the civil investigative demand," *Id.* at 1, where CFPB already has a substantial portion of the information in its possession. Instead of seeking enforcement of the portions of the First and Second CIDs that were dissimilar, CFPB impermissibly demands that the Law Firm duplicate its prior submission.

CFPB tries to gloss over this important point with feeble process arguments that could have been argued at the First CID Show Cause Hearing in November 2019 had CFPB not unilaterally withdrawn the First CID. For instance, the Bureau complains that the prior submission was not "in a format the Bureau could accept." *Id.* at 3 (citing Assae-Bille Decl., ¶ 8 (Apr. 24, 2020)). Implicit in this argument is an admission that CFPB possesses the materials the Law Firm submitted. And CFPB does not explain how the Law Firm's submission of materials in the nonproprietary, fully accessible format in which they are kept in the ordinary course of business is somehow the same as CFPB not having the documents in its possession. Further, CFPB claims that the Law Firm "never certified that any responses it produced were true and complete, as the [First] CID required." *Id.* at 3 (citing Assae-Bille Decl., ¶ 8 (Apr. 24, 2020)). Again, this is a minor procedural issue that does not contradict the fact that CFPB already has in its possession many of the documents of which it asks this Court to order production.

CFPB also claims that it does not have in its possession "responses to interrogatories" or "written reports."  Am. Pet. to Enforce CID, ECF No. 6, ¶ 14. The Amended Petition does not explain what CFPB did with the Law Firm's prior responses—let alone attempt to offer a process defect that would render answers already provided unreadable or otherwise nonconforming.  Additionally, to the extent that CFPB seeks documents related to the Law Firm's client, FedChex, and FedChex's client, Follett Corporation, those companies are subjects of their own CIDs that seek the same communications and information demanded in the Second CID, as it pertains to them.  CFPB has conveniently omitted the fact that Follett complied with CFPB's request on or about March 12, 2020, and, on information and belief, FedChex has complied as well.  The Second CID should exclude information already obtained from these sources because it is duplicative.

All this redundancy does not come without a cost.  Rather than simply looking at the information already in its possession and seeking that which is not, CFPB seeks to impose further cost on the Law Firm.  The Law Firm has already outlined in its Motion for Stay Pending Appeal that its compliance with the First CID has put the Law Firm on the verge of financial ruin, only to have CFPB self-moot that CID.  Now CFPB insists that the Law Firm must repeat and reformat that production.  For a small business already struggling during a global pandemic, the

54

additional and unnecessary cost of redundant production is as unreasonable as it is callous.

Thus, the Second CID is unenforceable because it includes information already in its possession. And by demanding production of documents and responses to interrogatories already in its possession, CFPB's Second CID is *per se* overly broad and unduly burdensome.

## CONCLUSION

For the foregoing reasons, Respondent respectfully requests that this Court reverse the district court's judgment and order the dismissal of the Second CID.

Respectfully submitted,

Dated: March 5, 2021

_____

Michael P. DeGrandis
Jared McClain
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
tel.: (202) 869-5210
mike.degrandis@ncla.legal
jared.mcclain@ncla.legal

*Counsel to Respondent-Appellant*
*Law Offices of Crystal Moroney, P.C.*

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,759 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (16.0.13628.20318) 64-bit in 14-point Times New Roman.

Dated:  March 5, 2021

Michael P. DeGrandis
*Counsel to Respondent-Appellant*
*Law Offices of Crystal Moroney, P.C.*

# ADDENDUM

| | Description |
|---|---|
| **A** | Appealed Order (Aug. 19, 2020) (J.A.-9) |
| **B** | Appealed Opinion (Aug. 18, 2020) (J.A.-112-148) (relevant pages only) |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BUREAU OF CONSUMER FINANCIAL
PROTECTION,

                    Petitioner,

       v.

LAW OFFICES OF CRYSTAL MORONEY,
P.C.,

                  Respondent.

---

Case No. 20-CV-3240 (KMK)

ORDER

KENNETH M. KARAS, United States District Judge:

      For the reasons stated on the record at the Oral Argument on August 18, 2020, the Court

grants Petitioner's Petition to Enforce the Civil Investigative Demand, (Dkt. No. 6).

SO ORDERED.

DATED:     August 19, 2020
             White Plains, New York

                                       _____
                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

1   does deal with plainly incompetent or irrelevant information.

2   What makes information plainly incompetent or irrelevant is

3   where that information isn't targeted toward a legitimate

4   purpose, doesn't advance the exploration of issues related to

5   the CFPB's statutory duty, and that's our position here with

6   respect to the client confidences and names of clients and so

7   on and so forth.

8           So that's really the issue and why we think that

9   while we are subject certainly to CFPB inquiries regarding just

10  the collection of debt we'll say, that inquiry is limited to

11  third-party documents, it is limited to those sorts of things.

12  And Ms. Moroney, while she has turned over the vast majority of

13  that information, to the extent that there is more that's

14  required because the second CID has an additional two-year

15  timeframe roughly thereabouts, that would be an adjustment that

16  would have to be made if this Court decides to enforce a second

17  CID.  She's objecting to those legitimate portions of the CID.

18           That's all I have to say.

19           THE COURT:  All right.

20           Anything else from anybody?  Okay.

21           Well, what's the band say, a long strange trip it's

22  been.  So here we are.

23           Seila Law comes down which provides some

24  illumination, but what I want to do is give you a ruling now,

25  because if you wait for me to write an opinion, I think this

1    will not be in anybody's interest.  So I'm going to go through

2    some factual background.  Obviously what I relate to you here

3    is taken from submissions from both respondent and the Bureau.

4         Now, according to the Bureau, respondent is a law

5    firm that collects on delinquent or defaulted consumer debt on

6    behalf of various creditors.  Respondent also provides

7    information to credit reporting agencies about consumers from

8    whom it is seeking to collect debt, but respondent does clarify

9    and consistent themes throughout its position here in this case

10   that it is a law firm that provide legal advice and services to

11   clients.  Indeed, there's no disputing that, nor is there any

12   disputing the fact that Ms. Moroney is licensed to practice law

13   in this state and in New Jersey, and that her firm is regulated

14   by the New York and New Jersey Rules of Professional Conduct,

15   and of course her continued ability to practice as a licensed

16   attorney is conditioned upon strict adherence to those rules.

17        We all know the first CID was issued to respondent

18   back in June of 2017.  According to the Bureau, this CID sought

19   "substantially similar" information to the 2019 CID but it's

20   not identical.  What's more, the Bureau claims that respondent

21   produced a partial response to the 2017 CID but it withheld and

22   "clawed back a significant amount of material."  And there's

23   also a claim that some of the documents were not produced in

24   compliance with the Bureau's standards regarding electronically

25   stored information, that there was no certification, that their

1    responses to the 2017 CID were true and complete.

2            Now respondent counters by noting that it did provide

3    written responses to the interrogatories, produced thousands of

4    pages of documents and other data, and to the extent that there

5    was a decision to not produce certain documents, that was based

6    on the attorney-client privilege and other nondisclosure

7    principles, or because the material, the responsive materials

8    might have been inextricably intertwined with privileged

9    material.  But in particular what the Bureau contends is that

10   respondent originally identified about 1793 pages of responsive

11   material, along with 1150 pages of which was comprised of data

12   dictionary tables that were duplicative of Excel spreadsheets

13   that the respondent also produced, and that the respondent also

14   withheld responses to at least 15 of the Bureau's requests,

15   including 144 letters of dispute that it deemed to be

16   responsive to the Bureau's request for legal actions and

17   administrative proceedings filed against respondent or its

18   principals relating to the company's debt or information

19   furnishing activities.

20           Now respondent does claim that, well, first of all,

21   respondent has made the point that it retained ethics counsel

22   for independent advice, and relied on that advice in evaluating

23   its duty under Rule 1.6 of the New Jersey and New York Codes of

24   Professional Conduct to protect the information it deemed to be

25   covered by attorney-client privilege.  There was a request for

1    waiver from clients, which was declined.  And so from

2    respondent's perspective, the Bureau was putting respondent in

3    a position to violate ethical obligations regarding asserted

4    confidences.

5              There was correspondence that explained some of these

6    points and then ultimately what happened was is that in

7    November of 2019 the Bureau withdrew the 2017 CID.  That was on

8    November 4.

9              On November 14, the Bureau had issued the 2019 CID,

10   and all of what was requested is spelled out in the petition at

11   paragraph 1.  It's also Exhibit A to Ms. Assae-Bille's

12   declaration.  The respondent takes the view that the two CIDs

13   are not initiated due to any consumer complaints regarding any

14   of the purposes listed in the Notice of Purpose because

15   otherwise the Bureau would have indicated as such.

16             The CID was issued by a deputy assistant director of

17   the Office of Enforcement and was served on respondent by way

18   of certified U.S. Mail, return receipt requested.  The

19   materials were due by December 16 of 2019.  On December 2,

20   respondent and counsel for the Bureau met and conferred in

21   accordance with 12 C.F.R. 1080.6(c).

22             There was some discussion about modification, but

23   that was never forthcoming.  Instead, respondent filed a

24   petition requesting that the director set aside or modify the

25   CID which stayed the deadline for respondent to actually answer

1    the CID.  And this request is made both on constitutional and

2    statutory grounds and sought a modification to excuse

3    respondent from producing any material that had previously been

4    submitted in connection with the 2017 CID.

5          That petition was denied.  There was a request to

6    have respondent fully comply with the 2019 CID within ten days.

7    Also, the director determined that the respondent's petition

8    was untimely.

9          The bottom line here is that by March 19 of 2020,

10   counsel for respondent indicated that respondent did not intend

11   to comply with the 2019 -- not comply, respond to the 2019 CID.

12         So there's been no production of materials in

13   response to the CID, and as has been acknowledged, there's been

14   no privilege log with respect to the 2019 CID, but respondent

15   does aver that the only documents that have been withheld from

16   its response to the 2017 CID were those related to the practice

17   of law, not documents exclusively related to third-party debt

18   collection, and that respondent has produced all policies and

19   procedures that the Bureau had requested in the 2017 CID.

20         There's also, I mean I'll note this because

21   respondent makes this point in its papers, there is a pending

22   petition to enforce a CID against FedChex Recovery, which I'll

23   just call FedChex today, which is another one of respondent's

24   clients, which is out in the Central District of California.

25   From respondent's perspective, that CID seeks the same

1    information sought in the CID at issue here regarding

2    respondent's contacts with that client.

3            So the 2019 CID does contain notification of purpose.

4    According to the Bureau, the CID sought from respondent

5    materials that may be relevant to the Bureau's investigation

6    that were not already in its possession, including certain

7    interrogatories, written reports, documents, et cetera.

8            The requests in the CID include, among other things,

9    respondent's organizational structure, its employees, business

10   activities, debt-collection activity, identities of creditors

11   or third parties for whom respondent performed debt-collection

12   activities, information on consumer complaints and disputes,

13   policies and procedures, handbooks, guidance, and training

14   materials, and recordings and calls between respondent and

15   consumers or third parties related to debt-collection attempts.

16           All right, so just for the record, in terms of some

17   background of CFPB, it was created in 2010 by Congress as an

18   "independent financial regulator within the Federal Reserve

19   System."  The statute that enables the Bureau is the CFPA, or

20   Title X, of the 2010 Dodd-Frank Wall Street Reform and Consumer

21   Protection Act.

22           The Bureau is tasked with implementing and enforcing

23   financial consumer protection laws.  This is all laid out, of

24   course, in *Seila Law*.

25           Now, upon its creation, Congress transferred the

1    administration of 18 federal statutes to the Bureau and enacted

2    a new prohibition on any unfair, deceptive, or abusive act or

3    practice by certain participants in a consumer finance sector.

4    Also, the Bureau is able to implement this standard and the

5    statutes under its purview through binding regulations.

6            Also, along with its rule-making authority, the

7    Bureau also has adjudicatory authority, as it's allowed to

8    conduct certain administrative proceedings.

9            Congress vested the Bureau with certain enforcement

10   powers which allows it to conduct investigations, issue

11   subpoenas, and CIDs, initiate administrative adjudications, and

12   prosecute civil actions in federal court.

13           The Bureau is authorized to seek restitution,

14   disgorgement, injunction, and civil penalties up to $1 million

15   for each day that a violation occurs.

16           As part of its enforcement authority, the Bureau can

17   issue CIDs, which are a type of investigative administrative

18   subpoena.  In fact, the CFPA provides the Bureau with its

19   authority to issue the CIDs and enforce them in federal court.

20   For that I'm citing 12 U.S.C., Section 5562(c)(1) and (e)(1).

21           So under the CFPA the Bureau can issue a CID when "it

22   has reason to believe that any person...may have information

23   relevant to violation of federal consumer financial law."

24   That's from 5562(c)(1).

25           The Bureau can initiate a proceeding to enforce the

1    CID in federal court by filing a petition, which is what we're

2    dealing with here.

3              The director has the five-year term.  The director is

4    appointed by the President and does require Senate approval.

5              Until the Supreme Court's decision in *Seila Law*, the

6    President was able to remove the director only for

7    "inefficiency, neglect of duty, or malfeasance in office."  But

8    in *Seila Law*, the Supreme Court determined that the Bureau's

9    leadership by a single independent director violated separation

10   of powers, as it vested "significant governmental power in the

11   hand of a single individual accountable to no one," and that

12   the director's "insulation from removal by an accountable

13   President...rendered the agency's structure unconstitutional."

14   That's from 140 Supreme Court at pages 2203-4.  But the Supreme

15   Court did determine the removal restriction was severable from

16   the other provision of the law that established the Bureau.  So

17   the Court ruled that the agency may continue to operate, but

18   its director must be removable by the President at will.  Page

19   2192.

20             In terms of funding, the Bureau does not receive

21   direct appropriations from Congress.  Instead, each quarter the

22   Bureau receives funding directly from the Federal Reserve,

23   which transfers funds to finance the Bureau from "combined

24   earnings from the Federal Reserve System."  That's from Section

25   5497(a).  The Federal Reserve itself is funded outside the

1    appropriations process through bank assessment, as noted in

2    *Seila Law* at page 2194.

3              Each year the Bureau's director determines the amount

4    of funding "reasonably necessary to carry out" the duties of

5    the Bureau up to a cap of 12 percent of the combined earnings

6    annually adjusted for inflation.  In recent years, that budget

7    has exceeded a half a billion dollars.

8              To exceed the cap, the Bureau has to obtain

9    additional funding in the ordinary appropriations process.

10             The funding is not reviewable by Congress, including

11   the committees on appropriations in both the House and the

12   Senate, but the director does report annually to the House and

13   Senate appropriations Committee about the Bureau's "financial

14   operating plans and use of funds."  And that's spelled out in

15   5497(e)(4).

16             All right, so we got here because of the petition,

17   but also it's worth noting that the respondent brought an

18   action against the Bureau and against the director in her

19   official capacity seeking declaratory judgment and injunctive

20   relief against the bureau.

21             On January 22nd of this year, the Court did issue an

22   order to show cause.  Oral argument was held on February 27

23   where the Court from the bench denied the motion.  And then an

24   amended complaint was filed on April 30th.

25             The instant petition was filed April 24, which was

1    accepted by this Court as related, and then we've had really

2    very thorough and comprehensive briefing through the early part

3    of the summer and here we are.

4              In terms of legal standard, it is well established

5    "that an agency can conduct an investigation even though it has

6    no probable cause to believe that any particular statute is

7    being violated."  That's what the Second Circuit said in *US*

8    *versus Construction Products Research Inc*., 73 F.3d 464, 470.

9    For example, administrative agencies can investigate merely on

10   suspicion that the law is being violated.

11             The Court's role in a proceeding to enforce an

12   administrative subpoena, which is basically what we're dealing

13   with here, is very limited, what the Second Circuit noted in

14   *NLRB versus American Medical Response, Inc.*, but of course the

15   agency's efforts have to be reasonable.  Whatever information

16   they're seeking by way of the compulsory process has to be

17   reasonable, which is satisfied if an agency demonstrates that

18   the investigation is being conducted for a legitimate purpose,

19   that the inquiry may be relevant to that purpose, that the

20   information sought is not already in the administrative

21   agency's possession, and that the administrative steps required

22   have been followed.  That's all from *American Medical Response*

23   at page 192.

24             If a subpoena satisfies these requirements it's

25   typically enforced unless the party opposing it demonstrates

1    that the subpoena is unreasonable or issued in bad faith or for

2    some other improper purpose, or that compliance would be

3    unnecessarily burdensome.

4            In terms of the respondent's attacks on the subpoena,

5    I'll start with the funding structure, and respondent argued

6    that the Bureau itself is unconstitutional because it doesn't

7    receive appropriations from Congress, instead ceding Congress's

8    funding authority to the Bureau itself and to the President,

9    which violates, in respondent's view, the appropriations clause

10   and the vesting clause.  And this is all spelled in pages 14

11   through 19 of respondent's memorandum of law.  And what

12   respondent specifically argues is that in the wake of *Seila*

13   *Law*, that *Seila Law* ostensibly rendered the Bureau's funding

14   structure "inconsistent with the congressional statutory design

15   and purpose," and also is inconsistent with the constitutional

16   design and purpose given that it permits the President to

17   determine and direct the Bureau's funding and budget.  Of

18   course, the Bureau disagrees, and even goes so far as to say

19   that *Seila Law* resolved the issue of the CFPB's

20   constitutionality.

21           Article I, sections 1 and 9, provides that "no money

22   shall be drawn from the treasury, but in consequence of

23   appropriations made by law," and that "all legislative powers

24   herein granted shall be vested in a Congress of the United

25   States."

1          So with respect to the Appropriations Clause, the

2     Supreme Court has underscored its straightforward and explicit

3     command, "it simply means that no money can be paid out of the

4     Treasury unless it has been appropriated by an act of

5     Congress."  That's from *Office of Personnel Management versus*

6     *Richmond*, 496 U.S. 414, 424.

7          Here, the Bureau is funded from the earnings of the

8     Federal Reserve which Congress has, in fact, authorized by

9     statute.  I've already discussed 5497.  And that's important

10    here because the Appropriations Clause "does not in any way

11    circumscribe Congress from creating self-financing programs

12    without first appropriating the funds as it does in typical

13    appropriation and supplement appropriation acts," which is, in

14    the Court's view, exactly what Congress has done here.  That's

15    a quote from *AINS Inc. versus United States*, 56 Federal Court

16    of Claims 522, 539, I'll note a case that was affirmed by the

17    Federal Circuit but abrogated on other grounds by the Federal

18    Circuit.  Other cases that have addressed this issue is *CFPB*

19    *versus Think Finance, LLC*, 2018 WL 3707919 at *2, the District

20    of Montana there determined that the CFPB's funding does not

21    violate the Appropriations Clause; ditto the Central District

22    of California in two cases*, CFPB versus D&D Marketing*, 2016 WL

23    8849698, and *CFPB versus Morgan Drexen, Inc.*, 60 F.Supp. 3d

24    1082, 1089.  Indeed, although the Supreme Court referenced the

25    Bureau's funding structure in *Seila Law*, it did so to point to

1    the level of power vested in a director removable only for

2    cause not to independently suggest that the funding mechanisms

3    were somehow unconstitutional.  For example, on page 2203, the

4    Supreme Court noted "the CFPB's single-director structure

5    contravenes this carefully calibrated system by vesting

6    significant governmental power in the hands of a single

7    individual accountable to no one.  The director does not even

8    depend on Congress for annual appropriations."  So I think it's

9    fair to say that although the Bureau's funding structure was

10    not directly at issue in *Seila Law*, in deciding to sever the

11    for-cause removal provision of the CFPA, the Supreme Court did

12    note "the only constitutional defect we have identified in the

13    CFPB structure is the director's insulation from removal," and

14    that that constitutional defect "disappear[ed]" with a director

15    removable at will by the President.

16           It's also important to note that the courts have held

17    that Congress may "choose to loosen its own reins on public

18    expenditure.  Congress may also decide not to finance a federal

19    entity with appropriations."  This was noted in the *Morgan*

20    *Drexen* case at 1089.  Indeed, as the Bureau points out,

21    Congress has provided similar independence to other financial

22    regulators, like the Federal Reserve, the FDIC, the OCC, the

23    National Credit Union Administration, and the Federal Housing

24    Finance Agency.  And this was all discussed in *PHH Corp. versus*

25    *CFPB*, 881 F.3d 75, 81.  Also, *CFPB versus Navient Corp.*, 2017

1    WL 3380530 at *16, which lists these and some other agencies as

2    independent agencies that operate completely outside the normal

3    appropriations process.  Indeed, these other agencies have been

4    deemed to have complete, uncapped budgetary autonomy, as noted

5    in *PHH II*, 881 at page 81.  Indeed, the Federal Reserve has

6    been around for over 100 years, and like the CFPB, has broad

7    investigative and enforcement authority, including the power to

8    conduct on-site examinations of banks under its purview and to

9    impose certainly monetary penalties.

10         Also, I just find it unconvincing, although it's

11   certainly stridently argued that this is a narrow exception

12   limited to agencies that receive funding from fees and the

13   like.  There's really no authority to support this narrow

14   exception theory of the self-funded governmental entities.  I

15   think *PHH II*, the case, in fact, respondent cites for the

16   proposition, the DC Circuit found "the way the CFPB is funded

17   fits within the tradition of independent financial regulators"

18   and does not violate the Constitution.  In fact, the DC Circuit

19   totally *en banc* found that "the requirement that the CFPB seek

20   congressional approval for funding beyond the statutory cap

21   makes it more constrained in this regard than other financial

22   regulators."

23         Plus, Congress hasn't relinquished control over all

24   the agency's funding, so although the CFPA restricts the House

25   and Senate Appropriations Committees from reviewing the

1  Bureau's primary funding source, it doesn't strip Congress as a

2  whole of its power to modify appropriations as it sees fit.

3  That's from *CFPB versus ITT Educational Services*, Inc., 219

4  F.Supp. 3d 878, 896, that's A Southern District of Indiana

5  decision from 2015.  In fact, the *CFPB* has a formula-based

6  spending cap on the amount that the Bureau's director can

7  derive from the Fed, and the CFPA further "imposes a number of

8  other conditions on the director's use of the funds so

9  derived."  And that's from the *ITT* case page 896 n.12.

10         What's more, Congress "might not have exempted the

11  CFPB from congressional oversight via the appropriations

12  process if it had known the CFPB would come under executive

13  control."  But it "remains free to change how the CFPB is

14  funded at any time."  That's noted by *Navient Corp.*, 2017 WL

15  3380530 at *16.  And in fact, the *PHH I* case, which is *PHH*

16  *Corp. versus CFPB*, reported at 839 F.3d 1, at page 36 n.16,

17  "Congress can always alter the CFPB'S funding in any

18  appropriations cycle or at any other time.  Section 5497 is not

19  an entrenched statute shielded from future congressional

20  alteration, nor could it be."

21         And to the extent that the argument is that the

22  nondelegation doctrine applies because Congress has transferred

23  its authority to another branch of government, which in fact is

24  the argument that's made at page 15, the Supreme Court has

25  indicated that "in our increasingly complex society replete

1    with ever changing and more technical problems...Congress

2    simply cannot do its job absent an ability to delegate power

3    under broad general directives."  That's from *Gundy versus*

4    *United States*, 139 Supreme Court at 2123.  Thus, "a statutory

5    delegation is constitutional as long as Congress lays down by

6    legislative act an intelligible principle to which the person

7    or body authorized to exercise the delegated authority is

8    directed to conform."  And that's from the same page.  As such,

9    "the constitutional question is whether a Congress has supplied

10   an intelligible principle to guide the delegee's use of

11   discretion," and there's really been no explanation of what

12   aspect of the funding structure lacks that intelligible

13   principle.  In fact, by limiting the funding that the director

14   may request from the Fed, with a formula-based spending cap on

15   the amount, it seems clear that the CFPB does not lack for a

16   principle or have some sort of unguided or unchecked authority

17   granted to the CFPB.  So the Court finds that Title X does not

18   violate the appropriations and vesting clauses in the

19   Constitution.

20           Turning to the ratification issue, on July 2nd, the

21   Bureau filed a notice of ratification issued by the director.

22   She noted that "in her capacity as the director, she considered

23   the basis for the CFPB's decision to issue the CID to

24   respondent, to deny respondent's request to modify or set aside

25   the CID, and to file a petition requesting that the District

1    Court enforce the CID."  She also noted that she ratified this

2    decision on behalf of the Bureau and that she understood that

3    the President may now remove her with or without cause."  And

4    that's from paragraph three, four and five of her declaration.

5         The argument is that the 2019 CID is invalid because

6    it's the product of an unconstitutionally structured federal

7    agency, and when Director Kraninger acted prior to *Seila Law*,

8    she was an invalid agent acting without any authority, thus,

9    any actions taken by her were basically null and void and can't

10   be saved by ratification.  The second point is that even if

11   Director Kraninger was able to ratify her previous actions as

12   an unconstitutionally insulated director, the 2019 CID would

13   still be unenforceable because the ratification does not cure

14   the structural constitutional defect identified by the Supreme

15   Court, only the President himself can ratify the director's

16   prior acts.  The third argument is that even if a director had

17   validated her prior acts, she did not purport to ratify the

18   regs until the week after she ratified the enforcement action.

19   And finally, that the director failed to perform a detached and

20   considered judgment of the act that she ratified.

21        Now*, Seila Law* left open the question of validity of

22   a ratification by the director, but of course, the

23   circumstances there were different, as the CID had been issued

24   by a different director, Director Cordray, the first director,

25   and was subsequently ratified by Acting Director Mulvaney, who

1   the CFPB argued could be removed at will by the President

2   because of his status as an acting director.  The Supreme Court

3   found that the question of whether the alleged ratification, in

4   fact, occurred and whether it is legally sufficient to cure the

5   constitutional defect, the original demand...turned on

6   case-specific factual and legal questions not addressed below

7   and not briefed before the court.  So the court remanded that

8   question finding the appropriate course was for the lower court

9   to consider those questions in the first instance.  Of course,

10  the Court recognizes that Justice Thomas had a different view,

11  and it speaks for itself.  I'm sure you all have read it.

12          All right, so addressing sort of the arguments in

13  turn.  The first argument is, as I mentioned, that the actions

14  taken by the Bureau prior to *Seila Law* are nullities that

15  cannot be ratified.  And because the court's severance of the

16  removal provision in Title X was prospective, respondent argues

17  that when the director acted, she was an invalid agent, as

18  such, her acts are void *ab initio*.  And there's the other

19  argument, the related argument, that the ratification would

20  deprive the respondent of any remedy for the constitutional

21  violation, the separation of power violation, and vindication

22  for her claim that the Bureau was unconstitutionality ratified

23  to begin with.

24          And as I said, the other argument is that even if the

25  earlier actions could be ratified, only the President can do

1   ration, because the President was the Bureau's only lawfully

2   acting principal prior to severing the for-cause removal

3   provision.

4         Now, I think we all agree, and I think it was said so

5   during the argument, that the Supreme Court has made clear that

6   on the question of authorization or ratification, that this is

7   something that's typically governed by principles of agency

8   law.  And this is discussed in the *Political Victory Fund* case,

9   513 U.S. 88, 98, and lower cases precisely dealing with

10  challenges to the CFPB structure have noted such, among others,

11  the *Gordon* case, which is a Ninth Circuit case, reported 819

12  F.3d 1179, 1191, and then *RD Legal Funding*, 332 F.Supp. 3d 729,

13  785.

14        In *political Victory Fund* the Supreme Court has

15  looked to the restatement of agency to determine whether an

16  after-the-fact authorization by the Solicitor General related

17  back to the date of an unauthorized filing by the FEC such that

18  the authorization would make the filing timely.  The court

19  found that it didn't because under the restatement, "if an act

20  to be effective in creating a right against another or to

21  deprive him of a right must be performed before a specific

22  time, an affirmance is not effective against the other unless

23  made before such time."  That's at page 98.  The Court stated

24  that the rationale behind the rule was that it was "essential

25  that the party ratifying should be able not merely to do the

1    act ratified at the time the act was done, but also at time the

2    ratification was made."  The emphasis is on the but-also

3    phrase, same page.  Thus, because the filing deadline would

4    have already passed at the time the Solicitor General

5    authorized the act, the authorization in that case was invalid.

6            Now, courts have interpreted this as really amounting

7    to addressing a timing issue.  So, for example, *Advance*

8    *Disposal Services Eastern, Inc. versus NLRB*, 820 F.3d 592, 603,

9    and they utilized the principles of agency law to determine

10   whether a later ratification authorizes an earlier action by an

11   agent particularly with respect to appropriations clause

12   violations.  So what the Third Circuit said in the *Advance*

13   *Disposal* case is that the timing problem in *Political Victory*

14   *Fund* has since been read to require that the ratifier had the

15   power to reconsider the earlier decision at the time of

16   ratification.  And so there the Third Circuit considered three

17   general requirements for ratification in determining whether a

18   properly constituted NLRB and its regional director could

19   ratify an action taken by the regional director at a time where

20   the board lacked a valid quorum given invalid recess

21   appointments of several members.  So the three requirement are:

22   "First, the ratifier must, at time of ratification, still have

23   the authority to take the action to be ratified; second, the

24   ratifier must have full knowledge of the decision to be

25   ratified; third, the ratifier must make a detached and

1  considered affirmation of the earlier decision."  So there the

2  Third Circuit ultimately found that the requirements were

3  satisfied, and that's the bottom line.

4        Now in *Gordon*, which is the Ninth Circuit case, the

5  parties agreed that although Director Cordray's initial recess

6  appointment was invalid and did not satisfy the requirements of

7  the appointments clause, later renomination and confirmation

8  was valid.  So based on that, the Ninth Circuit determined that

9  a ratification issued by Director Cordray with respect to

10  enforcement action at issue in that case, paired with a

11  subsequent valid appointment, cured any initial Article II

12  deficiencies.  In reaching that conclusion, the Ninth Circuit

13  reasoned that "under the second restatement, if the principal,

14  [the](CFPB), had authority to bring the action in question,

15  then the subsequent ratification of the decision to bring the

16  case is sufficient."  That's from 1191.  It bears noting that

17  the Ninth Circuit did cite the "less stringent" third

18  restatement of agency, Section 4.04 comment B., which "advises

19  that a ratification is valid even if principal did not have

20  capacity to act at the time, so long as the person ratifying

21  had capacity to act at the time of ratification."  So the Ninth

22  Circuit found that because Congress statutorily authorized the

23  Bureau to bring the action in question through the CFPA, the

24  Bureau had authority to bring the action at the time the

25  enforcement action was initiated, and thus, the director's

1    ratification, Director Cordray's ratification, after his proper

2    appointment resolved any appointment clause deficiencies.

3          So, as in *Advance Disposal* here, the Court's view is

4    that there appears to be no limitation that would prevent

5    Director Kraninger from bringing an enforcement action against

6    respondent at the time, given that she is now removable at will

7    by the President.  Indeed, I think that was conceded during

8    argument.  Furthermore, if the director is considered to be

9    both the agent and the principal, like the regional director in

10   *Advance Disposal*, she better than anyone else had full

11   knowledge of her earlier action.  And, as in *Gordon*, here, if

12   the CFPB, if the Bureau is to be considered the principal, and

13   Congress authorized the Bureau to issue CIDs and bring the

14   actions in federal court to enforce consumer protection

15   statutes and regulations.

16         Now, it's true that some courts have distinguished

17   between ratification and cases involving appointments clause

18   violations and those involving structural defects.  So this is,

19   of course, discussed and argued in *RD Legal Funding* by Judge

20   Preska where she thought the distinction was dispositive.  But

21   unlike in the *RD Legal Funding* case, here the for-cause removal

22   provision has been severed and the structure of the Bureau is

23   no longer in contravention of the Constitution.  So the

24   constitutional deficiency issue doesn't exist here anymore.  Of

25   course, Judge Preska didn't have the benefit of the *Seila Law*

1   decision, which we obviously have here.  As such, the relevant

2   question seems to be whether the constitutional violation has

3   been remedied and whether the remedy was effective and

4   adequately addressed the prejudice to respondent from the

5   constitutional violation.  And that's the framing that was set

6   forth by the DC Circuit in the *Legi-Tech* decision, 75 F.3d 704,

7   708.  If that's true, then dismissal of the enforcement action

8   is neither necessary nor appropriate.

9          And I think *Legi-Tech* is instructive here as one of

10  the few cases where a court examined whether ratification of a

11  previously brought enforcement action, in light of a structural

12  constitutional defect that had been cured, was sufficient to

13  remedy respondent's claimed injury against whom the enforcement

14  action was taken.  In that case, what the DC Circuit did is it

15  handled a challenge to litigation brought by the FEC after the

16  circuit had determined that the agency's structure violated the

17  Constitution in the case called *FEC versus NRA Political*

18  *Victory Fund*, given the presence of two congressional officers

19  as non-voting *ex officio* members of the FEC.  As in *Seila Law*,

20  however, the DC Circuit determined that the provision was

21  severable and the FEC thereafter voted to reconstitute itself,

22  excluding those *ex officio* members from all proceedings and

23  ratified former actions, including the agency's previous

24  probable cause finding and civil enforcement action.

25          Just as has happened here, the respondent in that

1    case argued that separation of powers is a structural

2    constitutional defect that made the entire investigation void

3    and that the FEC's later ratification of the PC finding

4    couldn't cure the constitutional violation given that the vote

5    at the end of the administrative process doesn't the remove the

6    taint, the structural taint, from the sequence of the decision.

7             And there the DC Circuit even acknowledged the

8    respondent was, in fact, prejudiced given the structural defect

9    in place at time, but the court framed the question as "the

10   degree of continuing prejudice after the FEC's reconstitution

11   and ratification," at page 708.

12             The DC Circuit assumed that no matter what course was

13   followed, other than a dismissal with prejudice, some effects

14   of the unconstitutional structure of the FEC are to be presumed

15   to have impacted on the action.  The court nonetheless

16   determined there was no ideal solution to that problem because

17   "even were the commission to return to square one, it is

18   virtually inconceivable that its decisions would differ in any

19   way the second time from that which occurred the first time."

20   And that's what I think we have here, and that's what I

21   mentioned during argument.  But even if the Court were to

22   dismiss this enforcement action, there's really no reason to

23   believe that the Bureau's decision to issue the CID to bring an

24   action would differ another time around.  And I think that's

25   been acknowledged here.  So, as in *Legi-Tech*, where there is no

1   significant change in the membership of the commission, there's

2   been no significant change in the leadership here, forcing the

3   Bureau to start at the beginning of the process, given what the

4   DC Circuit described as human nature, "promises no more

5   detached and pure consideration of the merits of the case than

6   in this case the Bureau's ratification decision reflected."  So

7   the more efficient and sensible course seems to be to take the

8   ratification of this prior decision at face value and treat

9   that as the adequate remedy for the constitutional violation

10  bearing in mind "the discretion the judiciary employs in the

11  selection of remedies."

12         Indeed, ratification has similarly been found to be

13  an effective cure in cases involving appointments clause

14  violations that were later resolved, particularly when a

15  dismissal would likely result in a similar administrative

16  procedure.  So one case is the DC Circuit's decision in *Wilkes*

17  *Barr Hospital Company LLC versus NLRB*.  There's the *Doolin*

18  *Security Savings Bank* case, 139 F.3d 214, *Intercollegiate*

19  *Broadcast Systems*, 796 F.3d at 117.

20         Also, it's bears noting that before *Seila Law*, at

21  least two courts determined that even if the CFPA's for-cause

22  removal provision was severable, the enforcement action would

23  still being effective.  And I'll note both a *PHH I* and *II* cases

24  where then Judge Kavanaugh determined that the for-cause

25  removal provision was, in fact, unconstitutional but that it

1   was severable from the rest of the CFPA.  Judge Kavanaugh then

2   considered the petitioner's statutory objections to the

3   enforcement action and vacated the action on statutory grounds

4   but not based on the structural constitutional violation,

5   "because the constitutional ruling would not halt the CFPB's

6   ongoing operations or the CFPB's ability to uphold the order

7   against the petitioners."

8            And a similar decision was reached by Judge McMahon

9   in *CFPB versus NDG Financial Corp.*, 2016 WL 7188792.

10           Now, to the extent that there's the argument that not

11  only would this ruling deprive respondent of a remedy in this

12  case but also in the related case, the Court does not agree.

13  In the related case, the respondent seeks a declaratory

14  judgment that the CFPB'S single-director structure violates the

15  Constitution, but that's precisely the remedy that the

16  conclusion in *Seila Law* provides.

17           With respect to *Lucia versus SEC*, I think that case

18  is just different.  The Supreme Court there determined that the

19  appointment of an ALJ who presided over an enforcement

20  proceeding did not comport with the appointments clause.  The

21  court found that under its precedent, "one who makes a timely

22  challenge to the constitutional validity of the appointment of

23  an officer who adjudicates his case is entitled to relief."

24  That's from page 2055.  The court determined that the

25  appropriate remedy for an adjudication tainted with

1   appointments violation is a new hearing before a properly

2   appointed official.  But, here, as the Bureau points out, the

3   adjudication of the CID is before this Court, as is the

4   adjudication in the related case.  So it's an

5   apples-and-oranges comparison.  What's more, in *Lucia*, the

6   court found that another ALJ or the SEC itself would need to

7   hold a new hearing because the previous ALJ already both heard

8   the petitioner's case and issued an initial decision on the

9   merits.  But here, there's been no "adjudication," by the

10  Bureau or the director, with respect to the enforcement action

11  and also there's no substitute decision-maker to revisit the

12  decision such as another ALJ.

13        To the extent that the respondent argues that the

14  Supreme Court determined in *Seila Law* that the only lawfully

15  acting principal is the President, I just don't think that's a

16  fair reading of *Seila Law*.  Although the court, the Supreme

17  Court cited the well-established principle that the executive

18  power belongs to the President, it didn't issue any sort of

19  ruling on ratification in fact stating that "because it would

20  be impossible for one man to perform all the great business of

21  the state, the Constitution assumes that lesser executive

22  officers will assist the supreme magistrate in discharging the

23  duties of his trust."  Quoting from the writing of George

24  Washington.  Can you get a better source than that.  There

25  really isn't any other authority to support this proposition,

1    as clever as it is.

2              So the Court finds that where the for-cause removal

3    provision has been severed, and thus, the constitutional

4    violation has dissipated, the ratification of the prior action

5    is valid.

6              Now there's the other argument, as I said, there's

7    the argument that the director has not validly ratified the

8    Bureau's regulations and its related guidance documents that

9    her ratification of this action is invalid.  In fact, what the

10   respondent argues is because Director Kraninger ratified the

11   investigation and the enforcement on July 2 and regulations on

12   July 10, that she could not have attained the regulatory

13   authority to ratify this case until July 10 at the earliest.

14   And the respondent further argues that the ratification was, in

15   any event, ineffective, as "if anyone can ratify prior invalid

16   Bureau regulations, guidance documents, and enforcement

17   activities, only the President can."

18             The Court does not agree.  The Bureau's authority to

19   issue and enforce CIDs is derived not just from the CFPB but

20   from the CFPA, and in deciding that the Bureau was

21   unconstitutionally constituted, the Supreme Court determined

22   that the removal provision was severable from any other

23   statutory provision relating to the Bureau's powers and

24   responsibilities.  So the provisions related to the Bureau's

25   authority to issue CIDs, they remain valid based on *Seila Law*.

1          To the extent that there's this argument that the

2    director failed to perform a detached and considered judgment

3    of the actions she ratified, this argument is based on the

4    assumption that she couldn't have given the prior acts more

5    than a passing glance because it would have had to have been

6    done within a matter of days after *Seila Law*.

7          While it's certainly true a ratifier must make and

8    detached and considered judgment and not simply rubber-stamp an

9    earlier action, there's really no actual evidence to establish

10   that the director failed to conduct an independent evaluation

11   or make a detached considered judgment, it's merely speculation

12   based on sort of timing, but that's just, at the end of the

13   day, that's just not enough authority that says that somehow

14   that's enough.  So, for example, in *Advance Disposal Services*,

15   the Court noted that mere lack of detail in the director's

16   express ratification is not sufficient to overcome the

17   presumption of regularity.  In fact, elsewhere in that decision

18   the Third Circuit noted that the presumption of regularity

19   applied to the actions of an agency, and finding that those

20   opposing ratification, in that case, had "not produced evidence

21   that cast doubt on the agency's claim that the board of

22   director properly ratified the earlier actions."  And the party

23   argued only that ratification was a "rubber-stamp."  And also

24   *Legi-Tech*, the DC Circuit said that it couldn't examine the

25   internal deliberations of the commission, at least absent the

1      contention that one or more commissioners was actually biased.

2              Here, the ratification states that the director

3      considered the basis for the Bureau's decisions to issue the

4      CID, to deny respondent's request to modify or set aside the

5      CID, and to file a petition requesting that the district court

6      enforce the CID, and she ratified those decisions on behalf of

7      the Bureau.  In the Court's view, that is sufficient under the

8      circumstances.

9              All right, now in terms of the enforceability of the

10     CID, as noted, the Court's role here is extremely limited, but

11     of course the information being sought has to be reasonable.

12     I've gone through all this.  An agency does have to make only a

13     *prime facie* showing that the four requirements I discussed

14     earlier had been met.

15             In terms of the purpose of the investigation, the CID

16     indicates the purpose.  It's all laid out in the CID.  In the

17     Court's view, this reflects a legitimate, investigatory

18     purpose, as the CFPA expressly authorizes the Bureau to

19     investigate suspected violations of consumer protection laws,

20     such as the FDCPA and the FCRA, which is what is the purpose

21     here, among others.  I'll just note a couple of cases that have

22     come to similar conclusions, *CFPB versus Heartland Campus*

23     *Decisions, ESCI*, 2018 WL 1089806, as I said, among others.

24             Now the argument here is that respondent sort of

25     states the purpose of the CID, arguing that it falls under the

```
1    practice-of-law exception, acknowledging that although the

2    respondent's services include debt-resolution activities that

3    might be regulated by the Bureau as the third party, the Bureau

4    is prohibited from regulating the practice of law and that the

5    Bureau has "pressed its obstinate demand for information and

6    documents, including those created in respondent's practice of

7    law that respondent is duty-bound to protect from disclosure."

8    The practice-of-law exclusion instructs the Bureau may not

9    exercise any supervisory or enforcement authority with respect

10   to an activity engaged in by an attorney as part of the

11   practice of law under the laws of the state in which the

12   attorney is licensed to practice law.  So though while it's

13   true the CID sought information that regulated the practice of

14   law and that that would be impermissible on its face, that's

15   not the purpose of the CID.  In fact, the Bureau has made this

16   quite clear that that is not the purpose of the CID.

17          The nature of the CID and the investigation falls

18   under an exception to the practice-of-law exclusion.  Section

19   5517(e)(2) states that the exclusion "shall not be construed as

20   to limit the authority of the Bureau with respect to any

21   attorney to the extent that such attorney is otherwise subject

22   to any of the enumerated consumer laws or authorities

23   transferred."  So here the Bureau seeks information about

24   possible violations, as I said, of the FDCPA and the FCRA, both

25   of which respondent is subject to and the Bureau represents
```

1   that the purpose of the CID is not to investigate in the actual

2   practice of law but is instead meant to gather information

3   about respondent's debt-collection activity, which the CID

4   specifically defines as activities, including attempts to

5   collect a debt, either directly or indirectly, excluding the

6   provision of legal services.  I think respondent acknowledges

7   that that's not an impermissible purpose.  I think there's just

8   a question of the extent to which the documents themselves that

9   are being sought, for example, might implicate attorney-client

10  privilege.  And I will certainly talk about that in a minute.

11  But on its face, the Court finds that the purpose is

12  legitimate.

13          In terms of relevance, that could be broadly

14  interpreted, and the courts are supposed to defer to an

15  agency's appraisal of relevance.  And so, unless it's obviously

16  wrong, the Court's not going to question it.  Again, this gets

17  into the attorney-client confidences issue.  And the Bureau

18  obviously disagrees that it is trying to seek or retain

19  information that is covered by the privilege because, for

20  example, the communications being sought do not reflect

21  communications by clients seeking an opinion of law, legal

22  services, or assistance in some legal proceeding involving

23  respondent.  Instead, the CID seeks information related to

24  respondent's debt-collection business and specifically defines

25  debt-collection activities as excluding the provision of legal

1    services and directs respondent that if any responsive

2    materials were held on the basis of privilege that respondent

3    should submit a schedule of the documents and information

4    withheld that includes details, such as the subject matter,

5    dates, names, address, et cetera.

6              And any party asserting attorney-client privilege has

7    to demonstrate:  The asserted holder of the privilege is or

8    sought to become a client; that the person to whom the

9    communication was made is the member of a bar or a court, or

10   that person's subordinate; in connection with this

11   communication is acting as lawyer; the communication relates to

12   a fact the attorney was informed, A, by a client, B, without

13   the presence of strangers, C, for the purpose of securing

14   primarily an opinion of law or legal services, or assistance in

15   some legal proceeding, and not for the purpose of committing a

16   crime or tort, and the privilege has been claimed and not

17   waived by the client.  That's all spelled out in *SEC versus*

18   *Yorkville Advisors, LLC* 300 F.R.D. 152, 161.

19             As I said, it's pretty clear that the material that

20   the Bureau seeks is relevant in terms of how it relates to the

21   investigation and the statutory violations that the Bureau is

22   statutorily charged with investigating, and on the face the

23   requests appear to be related to debt-collection services

24   provided by respondent, and so they are relevant to the

25   investigatory purpose.

1          To the extent that there are broad assertions of

2     attorney-client privilege, that's really not going to get it

3     done.  So, for example, to the extent that there is a claim

4     that the Bureau seeks attorney-client confidences and

5     privileged documents and information, those are not really

6     detailed at all, there's no specific examples given, there's

7     nothing about relating to specific legal advice the respondent

8     had given.  So, for example, some of the documents that the

9     Bureau seeks, information on consumer complaints in recordings

10    of calls between respondent and consumers, that's not embodied

11    by the attorney-client privilege.  Just on its face it's just

12    not.

13         And it also should be I think undisputed territory

14    that to the extent an attorney acts as a collection agent, any

15    communications between that attorney and the client are not

16    protected by the attorney-client privilege.  Among other cases

17    that was noted in *Avoletta versus Danforth*, 2012 WL 3113151.

18    Again, the Bureau is saying that all it wants is information

19    related to respondent's activity and debt-collection

20    activities.

21         To the extent that there is information that is

22    privileged, then respondent can submit a privilege log, which

23    has not been done in connection with the CID.

24         And I think there's also, I think, force to the

25    Bureau's argument that Rule 1.6 specifically exempts an

1  attorney from any sort of responsibility to the extent the

2  information is required by an order of the Court.  Among other

3  cases, *In re Alghanim*, 2018 WL 2356660.

4       Thus, because the Court's view is that the Bureau is

5  not seeking privileged information, it's conducting an

6  investigation, and the respondent hasn't shown that the Court

7  should otherwise refuse to enforce the CID on the basis of

8  relevance, the Court finds that the Bureau has demonstrated

9  that the information it seeks is relevant.

10      Again, to the extent there are specific objections

11 because there are specific documents or portions of documents

12 that are privileged, then a privilege log can be submitted.

13      In terms of what's already in the Bureau's

14 possession, the Bureau I think persuasively makes the point

15 that the previously identified pages from the 2017 CID, there

16 were some issues about formatting which that was provided,

17 there was clawback.  So there was a clawback and redaction of

18 many of the pages that were responsive.  And to the extent

19 respondent generally has said, hey, I produced thousands of

20 pages in response to the 2017 CID, that's not sufficient to

21 rebut the Bureau's representation, its showing as to what it

22 has not been given.  Plus the 2017 and 2019 CIDs are not

23 identical.  And so absent more specific detail, the Court finds

24 this objection not to be persuasive.

25      In terms of the administrative steps taken, the only

1  argument here has to do with the ratification, but the Court

2  has already ruled on that.

3         With respect to FedChex issue, the Court agrees that

4  Rule 19 is essentially not applicable here, not applicable to

5  enforcement proceedings, and I don't think respondent has made

6  the showing that, even if it somehow did apply, that it should

7  apply here.  I'll note that the Court hasn't been able to find

8  a case within the Second Circuit regarding the applicability of

9  Rule 19 to enforcement proceedings, but there have been,

10  certainly are decisions that in the context of the SEC and CFTC

11  proceedings, that Rule 19 is not dispositive, among other cases

12  *SEC versus Princeton Economic International Limited*, 2001 WL

13  102333, at *1.

14         Even if it did apply, it's far from clear FedChex is

15  a necessary party.  To the extent that the respondent has

16  information that is responsive to the CID that might

17  tangentially relate to FedChex, then respondent should produce

18  that material.  To the extent that they are privileged, then

19  respondent can submit a privilege log, as previously discussed.

20         So for these reasons the Court grants the petition to

21  enforce the 2019 CID.  To the extent, as I said, that there are

22  objections, specific objections regarding privileged material,

23  respondent should submit a schedule of that material as

24  directed by the CID to the Bureau.  To the extent that the

25  respondent seeks modifications based on what it produced in

1   response to the 2017 CID, it can discuss this with the Bureau

2   and write specific details on the material if it feels

3   satisfied the requests from the 2019 CID that are duplicative

4   of the 2017 CID.

5              Sorry to keep you so long, is there anything else?

6              MS. ASSAE-BILLE:  Not from the Bureau, your Honor.

7              MR. DeGRANDIS:  For the respondent, we have nothing

8   further.  Thank you, your Honor.

9              THE COURT:  All right.  Have a pleasant afternoon.

10  Everybody stay healthy.

11             MR. DeGRANDIS:  Thank you, you, too.

12             MS. ASSAE-BILLE:  Thank you, your Honor.

13             (Proceedings concluded)

14  CERTIFICATE:  I hereby certify that the foregoing is a true and
    accurate transcript, to the best of my skill and ability, from
15  my stenographic notes of this proceeding.
                 ------------------------------------
16  Angela A. O'Donnell, RPR,Official Court Reporter, USDC, SDNY

17

18

19

20

21

22

23

24

25