# 20-3471

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

———————————

BUREAU OF CONSUMER FINANCIAL PROTECTION,
Petitioner-Appellee,

v.

LAW OFFICES OF CRYSTAL MORONEY, P.C.,
Respondent-Appellant.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————

**APPELLANT'S REPLY BRIEF**

———————————

**NEW CIVIL LIBERTIES ALLIANCE**
Michael P. DeGrandis
mike.degrandis@ncla.legal
Jared McClain
jared.mcclain@ncla.legal
1225 19th Street NW, Suite 450
Washington, DC 20036
tel.: (202) 869-5210

*Counsel for Respondent-Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ........................................................................................1

ARGUMENT ................................................................................................3

I. CFPB MISCONSTRUES *SEILA LAW* AND ITS APPLICATION HERE, OVERSTATING THE RELEVANCE OF RECENT SUPREME COURT DECISIONS ON STRUCTURAL CONSTITUTIONAL VIOLATION REMEDIES ............................3

    A. *Seila Law* Did Not Scrutinize the President's Unreviewable Power to Appropriate Funds to CFPB .....................................................................4

    B. Recent Supreme Court Decisions Regarding Remedies Available to Victims of Unconstitutionally Structured Agencies Support the Law Firm's Request for Prospective Relief ....................................................5

II. CFPB'S FUNDING STRUCTURE IS UNCONSTITUTIONAL AND BEARS NO RESEMBLANCE TO OTHER INDEPENDENT AGENCIES .....................................8

    A. Title X's Funding Structure Is Not a Valid Statutory Appropriation.....9

    B. Title X's Assignment of Appropriations Power to the President Is Invalid Because the Appropriations Power Is Nondelegable and Title X Does Not Provide an Adequate Intelligible Principle..............13

        1. Congress Cannot Delegate Its Appropriations Power, Nor May Presidents Exercise It ..................................................................13

        2. Title X Does Not Contain an Adequate Intelligible Principle.......16

    C. CFPB's Funding Structure Is Unprecedented ......................................20

III. RATIFICATION OF THE 2019 CID WOULD DENY THE LAW FIRM THE PROSPECTIVE RELIEF TO WHICH IT IS ENTITLED AND WOULD ENDORSE AN IRREGULAR RATIFICATION THAT WAS NEITHER DETACHED NOR CONSIDERED ......................................................................................22

    A. The Retroactive Effect of CFPB's Purported Ratification Directly Conflicts with the Law Firm's Right to Prospective Relief.................22

    B. CFPB's Irregular Ratification Was Neither Detached nor Considered ..................................................................................................25

IV. CFPB MISCHARACTERIZES THE NATURE OF ITS FLAWED CID AND APPELLANT'S OBJECTIONS TO IT ............................................................... 27

    A. Appellant Does Not Object to the CID Because It Is a Law Firm—Appellant Objects Because CFPB Is Using Its Investigation to Regulate or Interfere with the Practice of Law ................................... 27

    B. The Undisputed Facts Prove that CFPB Demands Information Already in Its Possession ..................................................................... 29

CONCLUSION ................................................................................................. 31

CERTIFICATE OF COMPLIANCE ................................................................. 32

# TABLE OF AUTHORITIES

## Cases

*Bowsher v. Synar*, 478 U.S. 714 (D.D.C. 1986) ..............................................18

*CFPB v. Seila Law LLC*, 997 F.3d 837 (9th Cir. 2021) .....................................7, 24

*Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937) ...................................11

*Clinton v. City of New York*, 524 U.S. 417 (1998) ...........................................19

*Collins v. Yellen*, No. 19-422 (June 23, 2021) ......................................... 3, 6, 22, 23

*Dep't of the Navy v. FLRA*, 665 F.3d 1339 (D.C. Cir. 2012) .................................15

*Endicott Johnson Corp. v. Perkins*, 317 U.S. 501 (1943) ....................................28

*FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993).................. 23, 24

*Field v. Clark*, 143 U.S. 649 (1892) ......................................................14

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ...........................................14

*INS v. Chadha*, 462 U.S. 919 (1983) .......................................................9

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001)........................................12

*Loving v. United States*, 517 U.S. 748 (1996) ........................................... 1, 14, 15

*Lucia v. SEC*, 138 S. Ct. 2044 (2018).......................................................7

*Mistretta v. United States*, 488 U. S. 361 (1989)..........................................16

*Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336 (1974) .....................20

*OPM v. Richmond*, 496 U.S. 414 (1990) .............................................. 10, 11

*PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018) (*en banc*) .............................21

*RNR Enters., Inc. v. SEC*, 122 F.3d 93 (2d Cir. 1997) .....................................30

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ......................................... *passim*

*Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212 (1989) .................................15

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ..................................4

*Sullivan v. Louisiana*, 508 U.S. 275 (1993)................................................25

*Synar v. United States*, 626 F. Supp. 1374 (1986)...................................... 18, 19

*United States v. Arthrex*, No. 19-1434 (June 21, 2021).......................................3, 6

*United States v. Lovett*, 328 U.S. 303 (1946) ..............................................11

*United States v. Will*, 449 U.S. 200 (1980)................................................12

*Waller v. Georgia*, 467 U.S. 39 (1984)....................................................25

*Waters v. Churchill*, 511 U.S. 661 (1994) ..................................................4

*Wayman v. Southard*, 23 U.S. 1 (1825) .............................................. 13, 14, 15

## Constitutional Provisions

U.S. Const. art. I, § 1 ..................................................................14
U.S. Const. art. I, § 7 ..................................................................14
U.S. Const. art. I, § 9 ..................................................................14

## Statutes

12 U.S.C. § 16 ...........................................................................22
12 U.S.C. § 243 .........................................................................21
12 U.S.C. § 1755 .......................................................................21
12 U.S.C. § 1815 .......................................................................21
12 U.S.C. § 4516 .......................................................................21
12 U.S.C. § 5497 .............................................................. *passim*
31 U.S.C. § 9701 .......................................................................20

## Regulations

12 CFR 1080.6 ..........................................................................26
12 C.F.R. 5562 ..........................................................................26

## Other Authorities

3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342
    (1833) ................................................................................16
Annual Financial Report FY2020 (Nov. 16, 2020) ...........................8, 17
Sean M. Stiff, Cong. Rsch. Serv., R46417, Congress's Power Over Appropriations:
    Constitutional and Statutory Provisions, *Summary* (June 16, 2020) .....................9

## INTRODUCTION

Respondent-Appellant Law Offices of Crystal Moroney, P.C.'s (the "Law Firm") appeal presents vital questions regarding the structure of the Constitution and its role in protecting civil liberties. Yet the relief it seeks is relatively modest. The Law Firm asks only that it be regulated by a federal agency that: (1) receives its funding through congressional appropriations established through the bicameralism-and-presentment lawmaking process; (2) answers to the President; and (3) confines the scope of its investigations to the agency's proper statutory boundaries. At present, Petitioner-Appellee Consumer Financial Protection Bureau ("CFPB") is not such an agency.

*First*, CFPB is not funded through congressional appropriations. CFPB's funding structure violates the Appropriations and Vesting Clauses because the President directs the Fed to transfer its self-funded resources to CFPB—up to nearly $700 million dollars each year—and neither the Fed nor congressional appropriations committees may alter or review the President's demand. *See* 12 U.S.C. § 5497(a)(1). This is a naked violation of the Nondelegation Doctrine, which prohibits Congress from assigning powers to the Executive that "call[] for the exercise of judgment or discretion that lies beyond the traditional authority of the President[.]" *See Loving v. United States*, 517 U.S. 748, 772 (1996).

*Second*, CFPB was not answerable to the President when it issued, adjudicated, and enforced the 2019 CID. The Supreme Court's *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), decision fixed that constitutional problem by removing the Director's tenure protection, yet CFPB nevertheless seeks to retroactively validate its defective CID. The *Seila Law* Court held that "the structure of the CFPB violates the separation of powers." *Id.* at 2192 (majority). It further noted that "structural protections against abuse of power [are] critical to preserving liberty." *Id.* at 2202 (cleaned up). If CFPB may retroactively validate a CID issued while CFPB was unconstitutionally free from presidential oversight, the Law Firm would be denied the prospective relief to which it is entitled: presidential initiation and prosecution of CFPB investigations.

*Third*, even if the 2019 CID can be saved through ratification, it is fatally flawed because it seeks information beyond the scope of its statutory authority. CFPB cannot regulate the practice of law or interfere with attorney-client relationships. *See* 12 U.S.C. § 5517(e)(1). The 2019 CID demands confidential and privileged information shared between the Law Firm and its clients, and CFPB complains that these documents were missing from the 2017 production. CFPB is wholly without statutory power to obtain such confidences. The dispute over confidences also demonstrates that the Law Firm already produced much of the nonprivileged and nonconfidential material responsive to the 2019 CID in its 2017

2

CID production.  Nonetheless, CFPB demands a duplicative document production and responses to already-answered interrogatories.  CFPB's scope of authority is not so broad.

One year ago, the Supreme Court described CFPB as having "[a]n agency structure … almost wholly unprecedented[,]" that "lev[ies] knee-buckling penalties against private citizens[,]" where power is concentrated in a single Director "accountable to no one."  *Seila Law*, 140 S. Ct. at 2201-03, 2202 n.8.  Despite *Seila Law*'s rebuke of its unconstitutional structure, CFPB proceeds against the Law Firm as if nothing had changed.  The Supreme Court's *Seila Law* remand is not a futile formalism.

## ARGUMENT

## I.     CFPB MISCONSTRUES *SEILA LAW* AND ITS APPLICATION HERE, OVERSTATING THE RELEVANCE OF RECENT SUPREME COURT DECISIONS ON STRUCTURAL CONSTITUTIONAL VIOLATION REMEDIES

CFPB mischaracterizes the nature of the claims and relief the Law Firm requests, which leads CFPB to erroneously conclude that *Seila Law*, *Collins v. Yellen*, No. 19-422 (June 23, 2021), and *United States v. Arthrex*, No. 19-1434 (June 21, 2021), foreclose the Law Firm's challenge to CFPB's funding structure and its prospective remedy.  To the contrary, they make clear that whether CFPB's funding structure is unconstitutional is an open question, and they support the Law

3

Firm's request for relief from a CID issued while CFPB was unconstitutionally structured.

### A. *Seila Law* Did Not Scrutinize the President's Unreviewable Power to Appropriate Funds to CFPB

CFPB takes gratuitous liberties reading *Seila Law* to imply that the Supreme Court issued a clean bill of health for Title X's provisions that are ***not*** related to its Director's removal). The Court did not, as CFPB claims, "closely examine[] the CFPA's funding provisions[.]" *Compare* Appellee Br. 14-15 *with Seila Law*, 140 S. Ct. at 2193-94.

CFPB's observation that "[t]he Court said nothing to suggest the Bureau's funding is inconsistent with the Appropriations Clause or otherwise problematic on its own" (Appellee Br. 14), is meaningless. "[C]ases cannot be read as foreclosing an argument that they never dealt with." *Waters v. Churchill*, 511 U.S. 661, 678 (1994) (plurality); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("We have often said that drive-by jurisdictional rulings of this sort … have no precedential effect."). The constitutionality of CFPB's funding structure was neither at issue nor briefed in *Seila Law*, and the Court stated expressly that it would not consider "case-specific factual and legal questions not addressed below and not briefed here." *Seila Law*, 140 S. Ct. at 2208 (plurality). The Court chose not to render an advisory opinion on CFPB's funding structure, so whether it

would uphold Title X's *sui generis* funding structure, or any other provision of the statute, remains an open question.

### B. Recent Supreme Court Decisions Regarding Remedies Available to Victims of Unconstitutionally Structured Agencies Support the Law Firm's Request for Prospective Relief

CFPB misinterprets how *Seila Law*'s severance remedy relates to ratification and thus misunderstands how those issues pertain to the Law Firm. As a result, CFPB overstates the relevance of *Collins* and *Arthrex*. In *Seila Law*, the Court explained that it "cannot rewrite Congress's work by creating offices, terms, and the like[,]" so the Court was left with a "blunt" negative power to eliminate Title X's unconstitutional tenure protection. *Seila Law*, 140 S. Ct. at 2211 (plurality). The Court found that Title X's other "provisions are capable of functioning" without the Director's removal protection, and it believed that Congress would prefer a CFPB dependent upon the President to "***no agency at all***." *Id.* at 2209-10 (emphasis in original). The Court's willingness to sever the Director's constitutionally offensive tenure protection has no bearing on whether CFPB's threadbare ratification here adequately remedies the constitutional harm CFPB wrought against the Law Firm. As the Court stated explicitly, "whether … [ratification] is ***legally sufficient*** to cure the constitutional defect in the ***original*** demand[,]" is specific to each case. *Id.* at 2209 (emphasis added).

5

CFPB also incorrectly likens the relief sought by the Federal Housing Finance Agency (FHFA) shareholders in *Collins* to the relief requested by the Law Firm. CFPB claims that *Collins* rejected the view that actions by unconstitutional agency officials are void. *See* Kevin E. Friedl, 28(j) Letter to Court (June 24, 2021). This overstates *Collins*'s holding. Unlike the Law Firm (which seeks prospective relief), FHFA shareholders sought retrospective relief that included a return of dividend payments on a contract executed by a ***constitutional*** Acting Director. *Collins*, slip op. at 34-35. The Law Firm asks only that a constitutionally structured CFPB investigate it. The relief sought here is akin to the modest form of relief ordered in an APA suit where the agency decision is vacated, leaving the agency free to adopt a substantively and procedurally proper decision on remand from the court. *Collins* did not foreclose such relief.

CFPB also attempts to equate the PTO Director's review of PTAB adjudications in *Arthrex* with the remedy requested in this case, but the remedies are readily distinguishable. In *Arthrex*, the statutory restraint on the Director's authority to review APJ decisions was the constitutional violation—the APJs could not constitutionally issue decisions on behalf of the Executive Branch without the PTO Director's review. *Arthrex*, slip op. at 22-23. Severing the offending provision allowed for the PTO Director's review, so the harm was cured—the underlying adjudication was never at issue. *See id.* But here, the prospective

remedy sought by the Law Firm is to effectuate the authority of a removable Director by allowing CFPB to investigate only when consistent with the Director's valid statutory authority, in the first instance.

Were the Law Firm challenging CFPB's ratification of its regulations and guidance—which it is not—*Collins* (challenging the execution and performance of an agreement between FHFA and third parties) and *Arthrex* (challenging the lack of Executive review, not the underlying adjudication) might be more instructive. But the Law Firm is challenging an investigation that ***predates*** the President's control over the Director—and the separation-of-powers portion of that challenge was ***successful***. CFPB is wrong to interpret *Seila Law*'s statement that CFPB could "***continue*** to operate" as evidence that the Court thought CFPB could conduct ***past*** business as usual (*see* Appellee Br. 43 (quoting *Seila Law*)). "Continue" does not mean that CFPB's prior invalid acts could be resurrected with perfunctory ratifications. *CFPB v. Seila Law, LLC*, 997 F.3d 837, 839 (9th Cir. 2021) (Bumatay, J., dissenting) ("*Seila Law II* ") (explaining that the Ninth Circuit's acceptance of CFPB's post-*Seila Law* ratification "resurrects Goliath" so he can defeat David, as if David had not previously won). Ratifications, however, cannot go so far as to deprive regulated parties of any remedy at all for an agency's unconstitutional actions. *See Lucia v. SEC*, 138 S. Ct. 2044, 2055 n.5 (2018).

Neither *Collins* nor *Arthrex* changes this fundamental premise of remedies for victims of unconstitutional governmental action.

## II.  CFPB'S FUNDING STRUCTURE IS UNCONSTITUTIONAL AND BEARS NO RESEMBLANCE TO OTHER INDEPENDENT AGENCIES

Title X violates the Appropriations and Vesting Clauses of Article I of the Constitution by divesting Congress of its constitutional duty to make appropriations through law.  Title X purports to give the President, through CFPB's Director, authority to appropriate funding that is "reasonably necessary" to carry out the agency's mission, 12 U.S.C. § 5497(a)(1), up to a statutory cap, *id.* § 5497(a)(2)(A)-(B), but rendering the CFPB's funding "not … subject to review by the Committees on Appropriations of the House of Representatives and the Senate," *id.* § 5497(a)(2)(C).  In FY2020, the President could have demanded that the Fed deposit between $0 and $696 million into the Bureau Fund.  Annual Financial Report FY2020, at 6 (Nov. 16, 2020) ("FY2020 Report").[1]  CFPB's Director chose to appropriate $537 million and maintain $75 million in unobligated balances.  *Id.* at 9.  But Title X offers no guidance to the President regarding how much cash CFPB should keep in unobligated balances or whether it should operate on unobligated balances before demanding additional funds from the Fed.  The purported "principle" is permissive, not restrictive.  Contrary to CFPB's insistence,

---

[1] https://files.consumerfinance.gov/f/documents/cfpb_annual-financial-report_fy-2020.pdf.

8

this funding structure is not consistent with the Appropriations or Vesting Clauses. It was not addressed—let alone blessed—by the Supreme Court's *Seila Law* decision, and it is entirely unprecedented.

### A. Title X's Funding Structure Is Not a Valid Statutory Appropriation

Title X's funding structure is not a lawful exercise of Congress's appropriations power because it eliminates or limits Congress's duty to control the size, scope, and character of federal action. *See* Sean M. Stiff, Cong. Rsch. Serv., R46417, Congress's Power Over Appropriations: Constitutional and Statutory Provisions, *Summary* (June 16, 2020) ("Congress is therefore the moving force in deciding when and on what terms to make public money available through an appropriation, the Appropriations Clause is perhaps the most important piece in the framework establishing Congress's supremacy over public funds."). Title X unconstitutionally divests Congress of the power of the purse—a power which Congress cannot assign to another branch, nor can another branch accept it. *See INS v. Chadha*, 462 U.S. 919, 945 (1983) ("Explicit and unambiguous provisions of the Constitution prescribe and define the respective functions of the Congress and of the Executive in the legislative process.").

CFPB attacks a strawman in arguing that the Appropriations Clause does not require annual congressional authorization, and it hyperbolically argues that a ruling against its funding structure would invalidate "most federal spending"

9

(Appellee Br. 17-18). CFPB insists that it is refuting Appellant's arguments, but the Law Firm made no such argument in this Court, or below. *E.g.*, Appellant Br. 14 (arguing that when Congress surrenders appropriations authority to a law enforcement agency controlled by the President, the agency's funding structure is unconstitutional). CFPB is the only independent law-enforcement agency that combines a single Director serving at the pleasure of the President who establishes agency appropriations, which it demands from another independent agency's self-funded resources, and which cannot be rejected, modified, or reviewed by anyone, including congressional appropriations committees. This case does not implicate "***most*** federal spending." The CFPB's funding structure is *sui generis*.[2]

CFPB's reliance on *OPM v. Richmond*, 496 U.S. 414 (1990), is also misplaced. It cites *Richmond* as standing for the proposition that the Appropriations Clause only requires "that payments 'be authorized ***by a statute***.'" Appellee Br. 18 (quoting *Richmond*) (CFPB's added emphasis). But that is not right. *Richmond* held that a private plaintiff may not use estoppel against a government defendant as a means of securing monetary relief, because the

---

[2] The Law Firm is also not arguing, as CFPB claims, that Congress cannot pass appropriations for more than one year at a time (Appellee Br. 17-18). If Congress wants to fund CFPB for two years, it could do so, but that is not what it has done. It has created a self-contained funding ecosystem of indefinite duration that is effectively placed beyond congressional control and instead made exclusively beholden to the President. ***Those*** unique features are why its funding is unconstitutionally structured. *See* Appellant Br. 16-17.

Appropriations Clause requires an act of Congress to remedy a plaintiff's financial hardship. *Richmond*, 496 U.S. at 434. Just because all appropriations require *a* congressional act does *not* mean that *all* congressional acts related to the manner, amount, or conditions of appropriations are *ipso facto* constitutional.[3]

Indeed, the Supreme Court has previously invalidated appropriations statutes where they conflicted with other constitutional provisions. For example, the Court invalidated § 304 of an appropriations act in *United States v. Lovett*, 328 U.S. 303 (1946). Congress had passed a law that prohibited three government contractors from receiving payment for their services to federal agencies. *Id.* at 305. The government argued that § 304 was merely an appropriations provision and that Congress's exercise of its appropriations power was "plenary and not subject to judicial review." *Id.* The Court held instead that appropriations challenges are justiciable where appropriations contravene other constitutional provisions. *Id.* at 313. It concluded that the prohibition on the contractors' employment violated Article I, § 9's prohibition on bills of attainder and thus was an invalid exercise of the appropriations power. *See id.* at 316. The Supreme Court has similarly found appropriations constrained by other constitutional provisions. *See, e.g.*, *Legal*

---

[3] CFPB's reliance on *Cincinnati Soap v. United States,* 301 U.S. 308 (1937) (Appellee Br. 18) is equally unavailing. The Supreme Court held merely that the Revenue Act's imposition of a tax for the benefit of the Philippines was constitutional despite that it was earmarked for a specific purpose. *Cincinnati Soap,* 301 U.S. at 323-24.

*Servs. Corp. v. Velazquez*, 531 U.S. 533, 547 (2001) (invalidating the portion of the Omnibus Rescissions and Appropriations Act whose conditions on funding violated the First Amendment); *United States v. Will*, 449 U.S. 200, 226, 229 (1980) (distinguishing between unconstitutional statutory appropriations that violated the Compensation Clause and constitutional appropriations that did not implicate other constitutional provisions).

In this case, Title X's divestment of Congress's exclusive prerogative to fund CFPB by setting the amount of the agency's funding, and its assignment of that authority to the President, violates the Nondelegation Doctrine by contravening the Appropriations and Vesting Clauses. If Congress were to object to the President's funding or underfunding (perhaps regarding its use or failure to use unobligated balances) of CFPB—even if it were the result of a good-faith policy disagreement—Congress would have to muster a veto-proof supermajority in ***both*** houses to ensure funding for the agency at Congress's preferred level. Therefore, CFPB's assertion that Congress retains the "ability to increase, decrease, or even eliminate the Bureau's level of funding going forward" (Appellee Br. 22-23), is just CFPB's whistling-past-the-graveyard. That Congress may, hypothetically, one day correct the constitutional issue in this case does not mean that the current funding structure is constitutional. If that were the case, almost no statute would be susceptible to constitutional challenge.

12

B. **Title X's Assignment of Appropriations Power to the President Is Invalid Because the Appropriations Power Is Nondelegable and Title X Does Not Provide an Adequate Intelligible Principle**

Title X's divestment of Congress's power over appropriating funds to support CFPB's operations is an unconstitutionally standardless punt to the President. And even assuming *arguendo* that delegating appropriations is not a *per se* unconstitutional divestment of core legislative power, the delegation is nonetheless unconstitutional unless Appellee can satisfy two requirements: (1) the power Congress assigns must be delegable, and the delegatee must have the inherent authority to exercise the assigned power; and (2) the delegation must be governed by an intelligible principle. Title X's funding structure satisfies neither of these requirements.

1. **Congress Cannot Delegate Its Appropriations Power, Nor May Presidents Exercise It**

The Supreme Court has held that any power Congress wishes to assign to other branches of government must involve a completable circuit. In other words, the power must **both** be delegable **and** the delegatee must have the inherent authority to exercise any assigned power received. *See Wayman v. Southard*, 23 U.S. 1, 45-46 (1825) (explaining that the delegation must be consistent with the separation-of-powers role unique to the delegatee's branch). Neither element is satisfied here. Two circuit breakers interfere.

13

*First*, Congress's "power of the purse" is nondelegable because it requires bicameralism and presentment, to which Congress is an essential party. *Compare* U.S. Const. art I, § 9 ("No Money shall be drawn from the Treasury, but in Consequence of ***Appropriations made by Law***[.]") (emphasis added) *with* U.S. Const. art I, § 7 ("***Every Bill which shall have passed*** the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States[.]") (emphasis added). "The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress, U.S. Const., Art. I, § 1, and may not be conveyed to another branch or entity." *Loving*, 517 U.S. at 758; *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019).

Of course, the Nondelegation Doctrine does not bar assignment of some ***non-legislative*** tasks to another branch. For instance, Congress may assign fact-finding to the executive if that power is necessary to implement Congress's policies in contingent—if-this, then-that—laws. *See Field v. Clark*, 143 U.S. 649, 693 (1892) ("[The President] was the mere agent of the law-making department to ascertain and declare the event upon which [Congress's] expressed will was to take effect."). There is a critical constitutional difference, though, between "powers which are strictly and ***exclusively*** legislative[,]" and therefore cannot be assigned, and "powers which the legislature ***may*** rightfully exercise itself[,]" which may be assigned. *Wayman*, 23 U.S. at 42-43 (emphasis added). So the Nondelegation

14

Doctrine prohibits assignments that "call[] for the exercise of judgment or discretion that lies beyond the traditional authority of the President[.]" *See Loving*, 517 U.S. at 772 (distinguishing assignments regarding the President's role as Commander-in-Chief and the office's inherent power).

CFPB's reliance on *Skinner* is misplaced. While the *Skinner* Court declined to use "a different and stricter nondelegation doctrine in cases where Congress delegates discretionary authority to the Executive under its taxing power[,]" the taxing power is not like the appropriations power because taxes are administered and enforced, where appropriations are deliberated and discretized. *See Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 222-23 (1989). The *Skinner* delegation was a simple matter of factfinding and system implementation. *Id.* at 224 (requiring DOT to charge user fees to cover certain programmatic costs). By contrast, the Constitution prohibits an Executive agency (or its head) from deciding for itself how much federal appropriations it should receive.

*Second,* even if Congress could validly delegate appropriations authority, the President cannot exercise appropriations power because it is not a ministerial power inherent in his office. *See Wayman*, 23 U.S. at 45-46. In fact, the Appropriations Clause "is particularly important as a restraint on Executive Branch officers[.]" *Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) ("If not for the Appropriations Clause, 'the executive would possess an unbounded

15

power over the public purse of the nation; and might apply all its monied resources at his pleasure.'") (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213-14 (1833)).  The President's disbursements from the public sub-fiscs of monies held in trust by the Fed to CFPB's unobligated balance sheet are strictly nondelegable legislative tasks.

The Supreme Court has held that delegations may be permitted where the delegations arise out of necessity if "Congress simply cannot do its job absent an ability to delegate power under broad general directives."  *Mistretta v. United States*, 488 U. S. 361, 372 (1989).  Here, the CFPB cannot identify *any* reason why Congress "simply cannot do its job absent [its] ability to delegate" its appropriations power to the President.  If CFPB's funding structure is constitutional, every agency could be funded similarly—giving the President control over the funding of his own executive agencies until new veto-surmounting laws could be passed.  That would make a mockery of the separation of powers.

### 2.  Title X Does Not Contain an Adequate Intelligible Principle

CFPB claims that its funding structure provides an intelligible principle and that it "is functionally indistinguishable" from other "not to exceed" funding mechanisms.  Appellee Br. 23.  CFPB, however, provides *no* examples of similar "not to exceed" funding structures.  Instead, CFPB asks this Court not to "second-guess Congress" and to accept that its funding structure is like the "very broad

delegations" that the Supreme Court has upheld regarding air quality standards, public safety, commodities prices, and broadcast licensing. *See* Appellee Br. 23-24. But Title X's vague "reasonably necessary" appropriations guideline and statutory cap are not at all like the cases CFPB cites as "controlling."

The lack of an intelligible principle is evident in CFPB's own appropriations demands. For instance, despite that the cap on Fed earnings increased just $17 million, the Director increased appropriations by $69 million in FY2019-2020 while CFPB's unobligated balance *increased* by $7 million. FY2020 Report at 9. In FY2018, the Director "chose to use" $145 million of CFPB's unobligated balance in lieu of Fed-appropriations. *Id.* The Director could so choose because unobligated balances have no statutory floor or ceiling, and his choice was an exercise of unfettered discretion. Since the President and Director do not have to appropriate pursuant to a fact-finding report, "reasonably necessary" has no practical meaning—it just reflects the President's singular, essentially unchecked opinion that appropriations and unobligated balances should increase.

So CFPB's insistence that the "specific authorities and duties of the Bureau" listed in Title X make the President's "reasonably necessary" appropriations discretion more constrained (Appellee Br. 24-25) is not borne out by the facts. Since a President controls CFPB enforcement priorities and funding, he or she can over or underfund all or part of CFPB. Or a President could demand maximum

17

Fed earnings to accumulate unobligated funds with impunity—the President has an almost endless combination of appropriation and allocation choices. Title X's "150 pages of detailed provisions" (Appellee Br. 25) do not detail *any* administrative mechanism or standard that governs administrative (as opposed to discretionary) appropriations decisionmaking.

That is why CFPB's reliance on *Synar v. United States*, 626 F. Supp. 1374 (D.D.C.), *aff'd by Bowsher v. Synar*, 478 U.S. 714 (1986), is misplaced.[4] The *Bowsher* Court held the Gramm-Rudman-Hollings Act unconstitutional because Congress cannot delegate the power to enforce the Act to an executive controlled by Congress and not the President. *Bowsher*, 478 U.S. at 734. The reason the court believed that Congress could delegate the power to administer deficit reductions to the Comptroller (had he not been beholden to Congress) was that the "the *only discretion conferred* [was] in the ascertainment of *facts* and the prediction of *facts*." *Synar*, 626 F. Supp. at 1389 (emphasis added). The Law Firm does not object to Congress's assignment of fact-finding to the executive branch (as in *Field*), but that is not what Title X does. Appellant Br. 19-20.

Moreover, Gramm-Rudman-Hollings contained detailed principles that greatly confined the delegatee's discretion:

---

[4] Notably, the portions of *Synar* cited by CFPB are circumscribed by the *Synar* court's exhortation in Part III that "we depart from normal prudential practice and provide our views *obiter dicta*." *Id.* at 1382-83.

> Through specification of maximum deficit amounts, establishment of *a detailed administrative mechanism*, and determination of *the standards governing administrative decisionmaking*, Congress has made the policy decisions which constitute the essence of the legislative function.

*Synar*, 626 F. Supp. at 1391 (emphasis added). Where Congress delegates its appropriations authority, it must at least provide as detailed an intelligible principle as that in *Synar*. Title X contains no such detailed mechanisms or standards governing the Director's decisionmaking. Instead, the law merely suggests appropriations that are "reasonably necessary" to carry out the agency's mission, 12 U.S.C. § 5497(a)(1), up to a statutory cap, *id.* § 5497(a)(2)(A)-(B), and then proceeds to make the President's judgment on the matter *unreviewable* by Congress unless it can mount a veto-proof cohort of legislators, *see id.* § 5497.

*Clinton v. City of New York*, 524 U.S. 417 (1998), acknowledged that Congress sometimes authorizes "money to be spent on a particular item at the President's discretion." *Id.* at 466 (Scalia, J., concurring/dissenting in part). *Clinton* did not, however, bless the President's exercise of *unreviewable* discretion to determine the *amount of appropriation* in the first instance, nor his discretion regarding the use of the public sub-fiscs to benefit CFPB. CFPB conflates the power to spend with the power to appropriate.

An intelligible principle is one that limits executive discretion and directs conformance. *See Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336,

19

342 (1974). No principle in Title X—let alone an intelligible one—instructs the President how to determine what is "reasonably necessary." To make matters worse, Congress cannot direct conformance where, as here, the President's determination is unreviewable by Congress.[5]

## C.   CFPB's Funding Structure Is Unprecedented

CFPB erroneously states that its funding "is consistent with widespread and longstanding historical practice" and "is entirely typical of federal financial regulators" (Appellee Br. 12, 15). To the contrary, CFPB's funding structure was the first-of-its-kind when adopted in 2010, even prior to the Supreme Court's excising of Title X's tenure protection. *See Seila Law*, 140 S. Ct. at 2192 (observing that CFPB "lacks a foundation in historical practice and clashes with constitutional structure").

CFPB claims that the "Federal Reserve Board of Governors [Fed], National Credit Union Administration [NCUA], Federal Deposit Insurance Corporation [FDIC], and Federal Housing Finance Agency [FHFA] are all funded through appropriations in their enabling statutes rather than annual spending bills."

---

[5] CFPB argues that it is "more constrained" in its appropriations than self-funded agencies because CFPB's funding has a statutory cap. Appellee Br. 20. The exact opposite is true. Fees and assessments of self-funded agencies directly correlate to the services they provide or oversight activities they conduct. *See, e.g.*, 31 U.S.C. § 9701 (limiting self-funded agency fees to be based, in part, on the direct costs to the government).

Appellee Br. 15.  But the Fed levies assessments (12 U.S.C. § 243), and NCUA (*id.* § 1755), FDIC (*id.* § 1815(d)), and FHFA (*id.* § 4516), all collect fees, making them "self-funded" independent agencies.  *See PHH Corp. v. CFPB*, 881 F.3d 75, 95 (D.C. Cir. 2018) (*en banc*).  Self-funding is a formula that ties an agency's appropriations to its regulatory oversight functions (*e.g.*, the Fed) or services (*e.g.*, Post Office).  *See id.* at 95.  As regulatory oversight responsibilities or demand for services go up, appropriations fund the increased demand on agency resources.

CFPB falsely equates the use of assessments and fees by self-funded agencies with CFPB's presidential appropriations-demand.  CFPB relies upon Fed funds for its entire operation—it does not "defray the cost of their operations," as CFPB's citation to 12 U.S.C. § 5497(c) demonstrates (Appellee Br. 21).[6]  The funds CFPB receives are the result of unprecedented presidential discretion, and they are not at all tied to the subjects of CFPB's oversight responsibilities.  This is the stark constitutional difference between self-funded agencies and CFPB.

CFPB's attempt to equate its own funding to the Office of the Comptroller of the Currency's ("OCC") is equally inapt.  That OCC is headed by a single official answerable to the President is the only similarity, as OCC receives its funding through assessments and fees—the President does not determine OCC

---

[6]  Other CFPB activities may be defrayed by civil penalties, but the Civil Penalty Fund is not at issue in this appeal.

21

appropriations or demand funds from another independent agency.  12 U.S.C. § 16.

CFPB's attempts to normalize its funding structure by equating it to the Post

Office's postage rates, FDA's or PTO's application fees, and even to Article III

courts' filing fees (Appellee Br. 16) ignore the features discussed above that make

CFPB's funding structure utterly unique.[7]

### III. RATIFICATION OF THE 2019 CID WOULD DENY THE LAW FIRM THE PROSPECTIVE RELIEF TO WHICH IT IS ENTITLED AND WOULD ENDORSE AN IRREGULAR RATIFICATION THAT WAS NEITHER DETACHED NOR CONSIDERED

Ratification is unavailable where, as here, an unconstitutional officer (the

tenure-protected Director) commits an unlawful act (issuance of the 2019 CID).

But even if ratification could rehabilitate the unlawful CID, the irregular

ratification in this case fails because it was neither detached nor considered.

#### A. The Retroactive Effect of CFPB's Purported Ratification Directly Conflicts with the Law Firm's Right to Prospective Relief

CFPB concedes that it was unconstitutionally structured until *Seila Law*

severed its Director's tenure protection, and that its pre-*Seila Law* acts were

unlawful.  *Collins*, slip op. at 8 n.5 (Thomas, J., concurring).  Nonetheless, CFPB

asserts that its July 2, 2020 ratification retroactively saved the defective CID.  *See*

Appellee Br. 29-30.  As Appellant argued previously, *NRA Victory Fund* precludes

---

[7]  The September 11th Victim Compensation Fund (Appellee Br. 19) shares no similarities with CFPB's funding structure.  The Fund is administered by the Justice Department to compensate victims of the terrorist attacks.

ratification of the CID because CFPB lacked authority to issue it in 2019.

Appellant Br. 41-42 (citing *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 827-828 (D.C. Cir. 1993), *aff'd on other grounds*, *FEC v. NRA Political Victory Fund*, 513 U.S. 88 (1994)).

*Collins* is not to the contrary. *Collins* involved a challenge to an agreement executed by FHFA's Acting Director. *Collins*, slip op. at 26. The shareholders contended that the Court should set aside the properly executed agreement because later Directors (who were unconstitutionally insulated from removal) took steps to implement the agreement. *Id.* at 33. The Court held that the Acting Director was removable and the implementing Directors were validly appointed, so the agreement was not void *ab initio*. *Id.* Even still, the Court did not rule out the possibility that the removal provision affected the agreement's implementation and, therefore, was void because it harmed the shareholders. *Id.* at 34. The Court remanded the claim to determine whether there was such harm. *Id.*

Moreover, *Collins*'s statements regarding the availability of retrospective relief are of limited relevance to this case. In *Collins*, the Court directed the district court to consider whether a compensable constitutional harm arose from FHFA Director's tenure protection. *See id.* at 35-36. That was necessary because FHFA shareholders sought, among other things, to force Treasury to return all dividend payments to Fannie Mae and Freddie Mac. *Id.* at 11. The Law Firm,

23

however, seeks a forward-looking remedy to prevent CFPB from ***continuing*** to enforce a CID issued back when CFPB Directors enjoyed unconstitutional tenure protection from presidential control.  Appellant Br. 31-32.

CFPB claims that "[t]here is no longer any cause for concern that this investigation might be moving ahead without sufficient presidential supervision[,]" Appellee Br. 38.  CFPB glosses over *Seila Law*'s holding that CFPB's structure violated the separation of powers by summarily concluding that Appellant has already received its "appropriate remedy" (Appellee Br. 39).  This argument might be persuasive if CFPB had issued the CID after June 2020, but it is disingenuous where the CID at issue is a product of a 2019 structurally defective directorship. Ignoring the structural defect that contaminated the CID would leave the Law Firm without a remedy—prospective or otherwise.  "[N]o theory … would permit [a court] to declare the [agency's] structure unconstitutional without providing relief[.]"  *NRA Political Victory Fund*, 6 F.3d at 828.  Prospective relief precludes enforcement of an invalid CID.  *Seila Law II*, 997 F.3d at 839 (Bumatay, J., dissenting) (explaining that to allow retroactive ratification is to leave Seila Law with "no relief from the harms inflicted by an unaccountable and unchecked federal agency.").

Appellant is a small, woman-owned solo-practitioner law firm that CFPB has subjected to ***two*** unlawful CIDs—neither of which was issued with a whiff of

24

suspicion of wrongdoing[8]—and *two* unlawful enforcement actions, which have

burdened *four* years of Ms. Moroney's personal and professional life. The

investigations have caused her significant personal and financial hardship,

including the expenditure of at least $80,000 in CID compliance costs and legal

fees, and a reduction in her salary from $155,000 to $96,600. Appellant Br. 40.

CFPB's callous disregard for the harm it has caused is apparent. Ratification does

not "fully resolve" Ms. Moroney's suffering—it aggravates it. This Court must not

reward CFPB by retroactively blessing its deliberate wrongdoing.[9]

## B.  CFPB's Irregular Ratification Was Neither Detached nor Considered

Appellant rejects CFPB's claim that it made a detached and considered

judgment due to multiple irregularities in the process, not the lack of procedural

formality or any one irregularity (*see* Appellee Br. 37). The speed with which

CFPB ratified more than three years of investigations may not be dispositive, but

especially when judged in full context, it is an important factor in determining

---

[8] After four years of investigations and the Law Firm's compliance with the district court's order enforcing the 2019 CID, CFPB has not identified a single consumer complaint that gave rise to the investigations.

[9] CFPB cites *Waller* and *Sullivan* (Appellee Br. 40) to argue that the CID should not be dismissed, but these are inapposite criminal cases. *Waller v. Georgia* dealt with evidence suppression in a criminal trial, 467 U.S. 39, 40-41 (1984), and *Sullivan v. Louisiana* dealt with the structure of a criminal trial, 508 U.S. 275, 276 (1993). Unlike CFPB here, neither state attorney-general's office was constitutionally compromised.

whether the agency adequately reconsidered its prior actions before declaring them ratified. The concerns arising from CFPB's exceedingly quick ratification decision are compounded by the incongruence and speed with which CFPB ratified a decade's worth of regulations.

CFPB cannot claim a presumption of regularity under these facts. CFPB's argument that regulation-ratification is irrelevant because its authority to issue and enforce CIDs is statutory (Appellee Br. 37) obscures the important role that the regulations play in CFPB's enforcement scheme. As Appellant previously noted, regulations regarding pre-enforcement conditions (among others) control whether CFPB may enforce its CIDs. Appellant Br. 36 (citing 12 CFR 1080.6(c)(3) & (e)).

CFPB also argues that the CID does not seek information already within its possession because, in CFPB's own words, "[t]he Bureau's regulation at 12 C.F.R. 5562 requires that responses to the Bureau's CID be submitted in a medium requested by the Bureau." J.A.-74. CFPB cannot have it both ways—its regulations cannot be irrelevant to assessing the investigation's validity *and* the basis for claiming that it did not seek duplicate productions of documents in the 2019 CID.[10] CFPB's rush to ratify the 2019 CID is demonstrably irregular.

---

[10] CFPB goes so far as to argue that its formatting regulations are not "mere technicalities" because they enhance the "integrity of information collected[.]" Appellee Br. 52. If ignoring formatting "would render these important

**IV.    CFPB MISCHARACTERIZES THE NATURE OF ITS FLAWED CID AND APPELLANT'S OBJECTIONS TO IT**

Constitutional and ratification objections notwithstanding, the CID is unenforceable for two further reasons. *First*, CFPB cannot demand attorney-client confidences and privileged materials in this enforcement action. *Second*, the CID is impermissibly overbroad because CFPB freely admits that it has documents and information in its possession that are responsive to the CID. Thus, the undisputed facts demonstrate that the court below clearly erred enforcing the defective CID.

**A.    Appellant Does Not Object to the CID Because It Is a Law Firm—Appellant Objects Because CFPB Is Using Its Investigation to Regulate or Interfere with the Practice of Law**

The Law Firm never argued that CFPB cannot investigate its debt recovery activities "because it is a law firm" (Appellee Br. 49). Appellant claims no general exemption for law firms from CFPB investigations. Appellant's objection is instead to CFPB's demand for attorney-client privileged information and confidential client documents of which the Law Firm is merely a custodian. Federal law prohibits CFPB from regulating the practice of law or interfering with the attorney-client relationship, *see* 12 U.S.C. § 5517(e)(1), but that is exactly what CFPB is doing here.

---

requirements a dead letter" (Appellee Br. 52), it cannot be true that the order of ratifications of enforcement actions and regulations is immaterial.

27

CFPB is flat wrong that "Respondent has made no effort to avail itself of" the civil litigation-like process for claims of privilege (Appellee Br. 50-51). The parties agree that the 2019 CID is a product of CFPB's failure to prosecute the 2017 CID. *See* J.A.-113. In the district court, CFPB acknowledged that the Law Firm produced a privilege log regarding documents it withheld from the 2017 CID production. J.A.-74. CFPB objected to the log's sufficiency, J.A.-74, but that is not the same as making "no effort" to resolve the dispute regarding privileged materials.

The 2019 CID's ostensible purpose is to determine whether the Law Firm has been responsive to consumers who provide information contradicting the Law Firm's clients' records of consumers' debt and whether the Law Firm corrects its records and makes required reports in such instances. *See* J.A.-12. Appellant has not objected to producing those documents, but attorney-client confidences and privileged information are irrelevant to the CID's purpose. Client confidences and privileged materials are "plainly incompetent or irrelevant" to any conceivable "lawful purpose" of CFPB. *Compare Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943) (holding that where a subpoena issued by the Labor Secretary is not plainly incompetent or irrelevant, courts may not interfere with the administrative process) *with* J.A.-12. These privileged documents were the only

28

documents the Law Firm withheld in its 2017 CID production, and it produced a privilege log to identify them.

### B.   The Undisputed Facts Prove that CFPB Demands Information Already in Its Possession

CFPB freely admitted that "respondent *did* produce documents" pursuant to the 2017 CID in the enforcement proceeding below.  J.A.-74 (emphasis added).  It qualified that position by asserting that the "production was overwhelmingly in an improper format[,]" J.A.-74, but that is entirely different from its asserting here that "[t]he CID did not seek information in the Bureau's possession" (Appellee Br. 51).  The district court held that "[a]ccording to the Bureau, this [2017] CID sought 'substantially similar' information to the 2019 CID but it's not identical." J.A.-113.

One "substantial[] similar[ity]" is that both CIDs have the same January 1, 2014 "applicable period" start date.  *Compare* J.A.-25 *with* J.A.-47.  Documents responsive to the 2017 CID—which CFPB admits were in its possession prior to issuing the 2019 CID—must, *ipso facto*, include documents demanded in the 2019 CID.[11]  The district court clearly erred ruling to the contrary.  The court

---

[11] CFPB objects to the Law Firm's claw-back of some privileged documents and the parties do not agree on the extent of the Law Firm's compliance with the 2017 CID, but that is a question of degree, not whether CFPB possessed Law Firm documents and interrogatory responses that were responsive to both CIDs.  *See* J.A.-146.

acknowledged that CFPB had at least *some* documents from the 2017 CID, but it concluded that since the 2019 CID asked for more, it ruled in favor of CFPB. J.A.-146. The district court conflated the Law Firm's objection to the CID's demand for documents already in its possession, with the Law Firm's refusal, on constitutional grounds, to supplement its 2017 production pursuant to the 2019 CID.

CFPB's argument that improperly formatted material in its possession should not be categorized as being truly its possession (Appellee Br. 52), is also unavailing. The fully accessible format of documents produced in 2017[12]—which are word-searchable—and the lack of a certification regarding those documents, could have been objected to at the 2019 enforcement hearing, but CFPB self-mooted that case. There are no statutory or regulatory standards under which the 2017 documents already in CFPB's possession at the time of the 2019 CID's issuance could properly be described as "not in CFPB's possession." CFPB failed to satisfy its duty to examine those documents prior to issuing the 2019 CID. *See RNR Enters., Inc. v. SEC*, 122 F.3d 93, 96 (2d Cir. 1997) (explaining that SEC subpoenas may not seek documents already possessed by the agency).

---

[12] In 2017, the Law Firm provided CFPB with documents in the fully accessible format in which they were kept in the ordinary course of business.

The Law Firm's position is not that the 2017 production satisfied the 2019 demand—the 2019 CID seeks documents and interrogatory responses that are impermissibly duplicative of documents and interrogatory responses retained by CFPB after the 2017 investigation. It was clear error for the district court to rule otherwise.

## CONCLUSION

For the foregoing reasons, the Law Firm respectfully requests that this Court reverse the district court's judgment and dismiss the CID because: (1) CFPB's funding structure is unconstitutional; (2) ratification cannot save the defective CID; and (3) the CID exceeds CFPB's statutory authority and seeks documents already in its possession.

Respectfully submitted,

Dated: July 2, 2021

Michael P. DeGrandis
Jared McClain
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
tel.: (202) 869-5210
mike.degrandis@ncla.legal
jared.mcclain@ncla.legal

*Counsel to Respondent-Appellant*
*Law Offices of Crystal Moroney, P.C.*

31

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and 2d Cir. L.R. 32.1(a)(4)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,988 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (16.0.13628.20318) 64-bit in 14-point Times New Roman.

Dated: July 2, 2021

Michael P. DeGrandis
*Counsel to Respondent-Appellant*
*Law Offices of Crystal Moroney, P.C.*